UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>              Plaintiff,<br><br>      v.<br><br>LIGHTS OF AMERICA, INC., *et al.*,<br><br>              Defendants. | Case No. SACV10-01333 JVS (MLGx)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

FF

This matter was tried to the Court on October 30 and 31 and November 1 and 2, 2012.  The following issues were tried:

• Claim 1:  Whether defendants violated Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, by engaging in deceptive acts or practices in making false claims with regard to light emitting diode ("LED")  lamps replacing certain wattage incandescent lamps.

• Claim 2:  Whether defendants violated Section 5 of the FTC Act, 15 U.S.C. § 45, by engaging in deceptive acts or practices in making unsubstantiated and/or false claims with regard to the lifetime of their LED lamps.

• Claim 3: Whether injunctive relief is proper.

• Claim 4: Whether the defendants are liable for equitable monetary relief and/or disgorgement of ill-gotten gains.

(Pretrial Conference Order, ¶ 7, Docket No. 301.)  In accordance with the Court's usual practice in Bench Trials, direct examination was presented by way of declaration, and the witnesses were then tendered for cross-examination, followed in most cases by redirect and recross-examination.  The Court has received the parties's pretrial and post-trial Proposed Findings of Fact and Conclusions of Law (Docket Nos. 311, 314, 355, 356.)

After reviewing the procedural background, the Court now enter its Findings of Fact and Conclusions of Law.

FF                                              1

## PROCEDURAL BACKGROUND

1.  On September 7, 2010, Plaintiff Federal Trade Commission ("FTC") filed its Complaint for Permanent Injunctive and Other Relief against Lights of America, Inc. ("LOA), Usman Vakil and Farooq Vakil.  (Docket No. 1.)

2.  On November 4, 2010, LOA filed an answer to the complaint.  (Docket No. 19. )  Defendants Usman and Farooq Vakil filed a motion to dismiss the complaint.  (Docket No. 20.)  The Court granted the Vakils' motion to dismiss on December 17, 2010 and allowed the FTC to replead.  (Docket No. 33.)

3. The FTC filed its Amended Complaint on February 4, 2011.  (Docket Nos. 38 ,48.)

4.  On March 17, 2011, the FTC filed a motion to strike various affirmative defenses asserted by LOA and its demand for a jury trial.  (Docket No. 74.)

5.  Defendants Usman and Farooq Vakil each filed an Answer to the Amended Complaint on April 18, 2011.  (Docket Nos. 93, 94.)

6.  On April 29, 2011, the Court granted, in part, and denied, in part, the FTC's motion to strike.  (Docket No. 96.)  In so doing, the Court struck LOA's jury demand and its Fourth through Seventh Affirmative Defenses.

7.  The parties filed cross-motions for summary judgment on February 13, 2102.  (Docket Nos. 164, 165, 170, 184, and 167.)  On April 25, 2012, the Court granted the FTC's motion for partial summary judgment on Count I of the Amended Complaint, granted in part LOA's motion for summary judgment with

respect to Count II of the Amended Complaint, and denied the Vakils' motion for summary judgment.  (Docket No. 243 ["MSJ Order"].)

8.  On September 17, 2012, defendants filed a motion for reconsideration of the Court's order granting the FTC's motion for partial summary judgment. (Docket No. 264.  After further briefing, the Court denied defendants' motion for reconsideration on October 24, 2012.  (Docket No. 317.)

FINDINGS OF FACT

I.       The Parties.

9.  The FTC is an independent agency of the United States Government and was created by statute.   15 U.S.C. §§ 41-58.  The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce.

10.  The FTC may initiate federal district court proceedings, through its own attorneys, to enjoin violations of the FTC Act and to secure such other equitable relief, including rescission or reformation of contracts, restitution, disgorgement of ill-gotten gains and other equitable monetary relief, as may be appropriate in each case.  15 U.S.C. §§ 53(b), 56(a)(2)(A).

11.  LOA is a California corporation with its principal place of business in Walnut, California.  LOA is privately-owned, employing approximately 400 people in its manufacturing and distribution facility in Walnut, California, and in its distribution facility in Philadelphia, Pennsylvania.  LOA also operates a wholly-

owned subsidiary manufacturing facility in Shanghai.  (Stipulated Fact 5[1]; U. Vakil,[2] ¶ 13.)

12.  LOA transacts or has transacted business in this District and throughout the United States.  At all times relevant to the Amended Complaint, LOA has advertised, marketed, distributed, or sold lighting products to consumers throughout the United States.

13.  Starting in the late 1970s, LOA designed and sold Compact Fluorescent Light Bulbs ("CFLs").  (Stipulated Fact 18.)

14.  Defendant Usman Vakil is the founder, President, and Chairman of the Board of LOA and has a fifty-one % ownership interest in the company. (Stipulated Facts 8-10; U. Vakil Answer ¶ 8.)  Usman has a degree in mechanical engineering.  (U. Vakil, ¶ 3).

15.  Defendant Farooq Vakil is the Executive Vice President of LOA and has a forty-nine % ownership interest in the company.  (Stipulated Facts 11-12; F. Vakil Answer ¶ 9.)  Farooq has two degrees in civil engineering.  (F. Vakil, ¶ 3.)

16.  At all relevant times, the alleged acts and practices of defendants have been in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.  (LOA Answer ¶ 4.)

---

[1]The Stipulated Facts are found at paragraph 5 of the Final Pretrial Conference Order, Docket No. 301.

[2]The direct declarations are referred to by the witness' name; here U. Vakil.

FF                                                4

B.  <u>LOA's Business.</u>

17.  Since 2007, LOA has advertised, marketed and sold light bulbs ("lamps") that use 5mm LEDs as a light source.

18.  In 2003, Aijaz Taj ("Taj") joined LOA as an engineer.  (Stipulated Fact 17.)  Taj has been and is responsible for the development and engineering of LOA's LED Lamps.  (Taj, ¶ 2.)

19.  When LOA first decided to enter the LED market, Usman initially put Taj in charge of the LEDs and told him to start exploring what is available, what is not available, and what kind of products can be made using the LED technology. (U. Vakil, ¶ 18.)

20.  In March 1992, Brian Halliwell ("Halliwell") started working at LOA in marketing and sales.  (Stipulated Fact 14.)  Halliwell has a degree in electrical engineering.  (Halliwell, ¶¶ 1-2.)

21.  In 1997, Halliwell took over as VP of Marketing and Sales to replace Farooq Vakil.  (Stipulated Fact 16.)

22.  In 2007, after consultation with Taj and Halliwell, Usman made the executive decision for LOA to produce LED lighting products for consumers.  He made Taj, a qualified electrical engineer, with years of experience in lighting technology, the head of the LED-engineering department.  Usman delegated to Halliwell, having a degree in electrical engineering and, at the time, fifteen (15) years of marketing experience in lighting products, the responsibility marketing and sales of LED products.  (U. Vakil, ¶ 19; Nov. 1 Trial Tr. 170:1-23.)

23.  Halliwell headed the efforts at LOA to develop an LED product line and thus transition LOA's traditional CFL business to the SSL business.  (Halliwell, ¶ 19.)

24.  LOA's LED lamps are light bulbs that can be used in households in place of incandescent bulbs.  (LOA Answer ¶ 10.)

25.  An LED is a semiconductor light source.  LEDs have been used as indicator lamps in many devices and systems for a long time now and are increasingly used for other specific lighting applications.  Appearing as practical electronic components in 1962, early LEDs emitted low-intensity red light and later green, but modern versions are available across the visible, ultraviolet, and infrared wavelength spectrums.  (Ronen, ¶ 12.)

26.  When a light-emitting diode is forward-biased (switched on), electrons are able to recombine with holes within the device, releasing energy in the form of photons.  This effect is called electroluminescence and the basic color of the light (corresponding to the energy of the photon) is determined by the energy gap of the semiconductor. (Id., ¶ 13.)

27.  An LED is often small in area (less than 1mm$^2$), and optical components integrated into the package, *i.e.*, a lens, may be used to shape its radiation pattern. (Id., ¶ 14.)

28.  LEDs present many advantages over incandescent light sources including lower energy consumption, longer lifetime, improved physical robustness, smaller size, and faster switching.  (Id., ¶ 15.)

29.  The LED lamps manufactured and sold by LOA that are at issue in this case have the following model numbers: 2001LED10-65K, 2001LED53IN-65K, 2001LEDE53OUT-65K, 2001LEDE26-65K, 2002LEDP30-65K, 2002LEDR30-65K, 2003LEDP38-65K, 2004LEDDL-35K, 2025LED-30K, 2025LED-65K, 2025LEDE12-30K, 2025LEDE12-65K, 2026LED-30K, 2026LED-65K, and 2035LED-30K.  (Stipulated Fact 1.)

30.  The majority of the LED Lamps at issue in this case were manufactured and produced at LOA's facility in Shanghai, China.  (Trial Ex. 585 - LOA Resp. Int. Nos. 40-41.)

31.  LED light bulbs can produce the same amount of light as incandescent, compact fluorescent, and other lamps but LED light bulbs do so by using less energy (i.e., watts).  (Stipulated Fact 3.)

32.  LOA sold its LED Lamps through retailers located throughout the United States and Canada, including Walmart, Sam's Club, ACE Hardware, Costco, and Kroger, as well as other retail businesses.  (Stipulated Fact 19; LOA Answer ¶ 11.)

33.  Consumers also could purchase defendants' LED Lamps from Internet websites of numerous retailers, such as Amazon.com, Sam's Club, and ACE Hardware through at least October 2010.  (LOA Answer ¶ 11.)

34.  LOA widely disseminated its LED Lamps.  (LOA Depo. (Halliwell) 149.)

35.  LOA continues to advertise and sell LED and other types of lamps to the public through retailers.  However, the bulk of LOA's LED lamps presently use "power" LEDs as a light source, not 5 mm LEDs.  (LOA Depo. (Halliwell)  113.)

36.  LOA sold seven models of LED Lamps to different retailers: 2001, 2002, 2003, 2004, 2025, 2026 and 2035 models.  All used 5mm LEDs, all of which pointed in the same direction.  (Halliwell, ¶ 22.)

37.  The 2001 model was a small "MR-16" track light.  A picture of this product appears on the exhibits referenced on the table below.  (Halliwell, ¶ 23.)

38.  The 2002 models were flood lights.  A picture of this product appears on the exhibits referenced on the table below and samples of two versions are parts of Exs. 474, 476, and 478.  (Id., ¶ 24; F. Vakil,¶ 55.)

39.  The 2003 models were flood lights.  A picture of this product appears on the exhibits referenced on the table below and samples of four versions are parts of Exs. 474, 476, and 479.  (Halliwell, ¶ 25; F. Vakil, ¶ 55.)

40.  The 2004 models were accent down lights.  A picture of this product appears on the exhibits referenced on the table below and a sample of one version is part of Ex. 474.  (Halliwell, ¶ 26; F. Vakil, ¶ 55.)

FF                                              8

41.  The 2025 models were flame tip décor accent lights.  A picture of this product appears on the exhibits referenced on the table below and samples of four versions are parts of Exs. 474, 475, 481, and 482.  (Halliwell, ¶ 27; F. Vakil, ¶ 55.)

42.  The 2026 models were flame tip lights.  A picture of this product appears on the exhibits referenced on the table below and samples of two versions are parts of Ex. 475.  (Halliwell, ¶ 28; F. Vakil, ¶ 55.)

43.  The 2035 models were globe lamps.  A picture of this product appears on the exhibits referenced on the table below.  (Halliwell, ¶ 29.)

44.  LOA made claims about its LED Lamps on its product packaging. (Stipulated Fact 22.)

45.  Starting in February 2008, LOA sold its LED Lamps in product packaging that it designed.  (Stipulated Fact 21.)

46.  In its LED Lamps' packaging and product displays, LOA never informed consumers that it was selling its LED Lamps as part of a trial or test run of the products.  (Halliwell Depo. 150.)

47.  LOA prepared its LOA LED Lamp packaging with the expectation that consumers would rely on the information on the packaging. (LOA Depo. (Halliwell) 149.)

48.  Consumers purchasing LOA's LED Lamps would believe everything on the product packaging was true.  (Halliwell Depo. 150.)

49.  LOA advertised, marketed, promoted, distributed, offered for sale, or sold its LED Lamps using some or all of the following claims:  (1) comparing its LED Lamps to incandescent watt[3] bulbs; (2) identifying the lumen[4] output of its LED Lamps; and (3) stating that its LED Lamps would last a specified number of hours.  (LOA Answer ¶ 12.)

50.  The parties  stipulated that the following Exhibits at the specified Bates-numbered pages show representative images of LED Lamp product packaging that was used by LOA:

|   | Model No. | Deposition Exhibit and Bates No. |
|---|---|---|
| a | 2001LED10-65K | Ex. 159 at LOA-00000770 |
|   |   | Ex. 159 at LOA-00000754 |
|   |   | Ex. 320 at LOA-00170921 |
|   |   | Ex. 321 at LOA-00000199 |
|   |   | Ex. 289 at FTC00117 |

---

[3]Watt (W): the unit of electrical power (energy), defined as 1 Joule per second and which equals the product of 1 volt (DC or RMS AC) times 1 amp. (Ronen,  ¶ 53.)

[4]Lumen (lm): the unit of luminous flux (Φ), *i.e.*, the amount of light energy per unit time.  The overall light output of a luminous source is measured in lumens. A lamp's light output rating is expressed in lumens, and is a measure of the total amount of light emitted in all directions per unit time.  By definition, 1 lumen is the amount of light produced by a 1 candela source radiating out through 1 steradian (a specific cone shaped solid unit angle of 65.54 degrees) within an imaginary sphere surrounding the light source.  One candela illuminates the entire surface of a 1 meter radius sphere at an average 1 lumen for each square meter of surface of the entire sphere.  Because there are $4\pi$ or 12.57 steradians in a sphere, any 1 candela intensity light source produces 12.57 ($4\pi$) lumens of total visible light radiated in all directions.  (<u>See</u> Ex. 340, pp. 2, 5; Ronen, ¶ 46.)

|  | Model No. | Deposition Exhibit and Bates No. |
|---|---|---|
|  |  | Ex. 159 at LOA-00000776 |
|  |  | Ex. 320 at LOA-00170934 |
|  |  | Ex. 321 at LOA-00000196 |
| b | 2001LED53IN-65K | Ex. 159 at LOA-00000772 |
|  |  | Ex. 320 at LOA-000170922 |
|  |  | Ex. 321 at LOA-00000200 |
|  |  | Ex. 159 at LOA-00000756 |
|  |  | Ex. 159 at LOA-00000775 |
|  |  | Ex. 289 at FTC00115 |
|  |  | Ex. 320 at LOA-000170935 |
|  |  | Ex. 321 at LOA-00000197 |
|  |  | Ex. 289 at FTC00108 |
| c | 2001LED53OUT-65K | Ex. 159 at LOA-00000771 |
|  |  | Ex. 320 at LOA-000170923 |
|  |  | Ex. 321 at LOA-00000201 |
|  |  | Ex. 159 at LOA-00000755 |
|  |  | Ex. 159 at LOA-00000775 |
|  |  | Ex. 289 at FTC00116 |
|  |  | Ex. 320 at LOA-000170936 |
|  |  | Ex. 321 at LOA-00000198 |
|  |  | Ex. 289 at FTC00113 |
| d | 2001LEDE26-65K | Ex. 159 at LOA-00000760 |
|  |  | Ex. 159 at LOA-00000759 |
|  |  | Ex. 159 at LOA-00000757 |
|  |  | Ex. 320 at LOA-00170920 |
|  |  | Ex. 321 at LOA-00000199 |
|  |  | Ex. 289 at FTC00114 |
|  |  | Ex. 159 at LOA-00000779 |
|  |  | Ex. 289 at FTC00109 |
|  |  | Ex. 289 at FTC00112 |
|  |  | Ex. 320 at LOA-000170933 |
|  |  | Ex. 321 at LOA-00000195 |
|  |  | Ex. 321 atLOA-00000196 |
| e | 2002LEDP30-65K | Ex. 159 at LOA-00000785 |
|  |  | Ex. 159 at LOA-00000783 |

FF

| | Model No. | Deposition Exhibit and Bates No. |
|---|---|---|
| | | Ex. 159 at LOA-00000784 |
| | | Ex. 289 at FTC00125 |
| | | Ex. 289 at FTC00128 |
| f | 2002LEDR30-65K | Ex. 159 at LOA-00000794 |
| | | Ex. 289 at FTC00126 |
| | | Ex. 159 at LOA-00000798 |
| | | Ex. 159 at LOA-00000797 |
| | | Ex. 321 at LOA-00000203 |
| | | Ex. 320 at LOA-000170925 |
| | | Ex. 159 at LOA-00000780 |
| | | Ex. 289 at FTC00142 |
| | | Ex. 289 at FTC00127 |
| g | 2003LEDP38-65K | Ex. 159 at LOA-00000807 |
| | | Ex. 159 at LOA-00000793 |
| | | Ex. 159 at LOA-00000787 |
| | | Ex. 159 at LOA-00000786 |
| | | Ex. 289 at FTC00143 |
| | | Ex. 159 at LOA-00000789 |
| | | Ex. 159 at LOA-00000804 |
| | | Ex. 320 at LOA-000170926 |
| | | Ex. 321 at LOA-00000205 |
| | | Ex. 289 at FTC00144 |
| | | Ex. 289 at FTC00145 |
| | | Ex. 320 at LOA-00170938 |
| | | Ex. 289 at FTC00129 |
| | | Ex. 289 at FTC00130 |
| | | Ex. 320 at LOA-00170937 |
| | | Ex. 321 at LOA-00000204 |
| h | 2004LEDDL-35K | Ex. 159 at LOA-00000808 |
| | | Ex. 159 at LOA-00000769 |
| | | Ex. 320 at LOA-00170927 |
| | | Ex. 321 at LOA-00000206 |
| | | Ex. 159 at LOA-00000774 |
| | | Ex. 159 at LOA-00000799 |
| | | Ex. 320 at LOA-00170939 |

FF

|  | Model No. | Deposition Exhibit and Bates No. |
|---|---|---|
|  |  | Ex. 321 at LOA-00000207 |
|  |  | Ex. 289 at FTC00131 |
| I | 2025LED-30K | Ex. 320 at LOA-00170928 |
|  |  | Ex. 321 at LOA-00000210 |
|  |  | Ex. 159 at LOA-00000765 |
|  |  | Ex. 159 at LOA-00000766 |
|  |  | Ex. 289 at FTC00132 |
|  |  | Ex. 320 at LOA-00170940 |
|  |  | Ex. 321 at LOA-00000209 |
|  |  | Ex. 320 at LOA-00170946 |
|  |  | Ex. 321 at LOA-00000208 |
| j | 2025LED-65K | Ex. 321 at LOA-00000213 |
|  |  | Ex. 159 at LOA-00000767 |
|  |  | Ex. 159 at LOA-00000768 |
|  |  | Ex. 289 at FTC00134 |
|  |  | Ex. 320 at LOA-00170941 |
|  |  | Ex. 321 at LOA-00000212 |
| k | 2025LEDE12-30K | Ex. 320 at LOA-00170929 |
|  |  | Ex. 321 at LOA-00000215 |
|  |  | Ex. 159 at LOA-00000809 |
|  |  | Ex. 159 at LOA-00000761 |
|  |  | Ex. 159 at LOA-00000800 |
|  |  | Ex. 159 at LOA-00000752 |
|  |  | Ex. 159 at LOA-00000753 |
|  |  | Ex. 289 at FTC00147 |
|  |  | Ex. 289 at FTC00148 |
|  |  | Ex. 159 at LOA-00000812 |
|  |  | Ex. 289 at FTC00150 |
|  |  | Ex. 289 at FTC00138 |
|  |  | Ex. 289 at FTC00149 |
|  |  | Ex. 320 at LOA-00170942 |
|  |  | Ex. 321 at LOA-00000216 |
|  |  | Ex. 320 at LOA-00170948 |
|  |  | Ex. 321 at LOA-00000214 |
| l | 2025LEDE12-65K | Ex. 320 at LOA-00170930 |

FF

13

| | Model No. | Deposition Exhibit and Bates No. |
|---|---|---|
| | | Ex. 321 at LOA-00000220 |
| | | Ex. 159 at LOA-00000795 |
| | | Ex. 159 at LOA-00000796 |
| | | Ex. 159 at LOA-00000762 |
| | | Ex. 289 at FTC00135 |
| | | Ex. 289 at FTC00136 |
| | | Ex. 289 at FTC00137 |
| | | Ex. 321 at LOA-00000212 |
| | | Ex. 320 at LOA-00170943 |
| | | Ex. 320 at LOA-00170952 |
| | | Ex. 321 at LOA-00000222 |
| | | Ex. 320 at LOA-00170951 |
| | | Ex. 321 at LOA-00000219 |
| | | Ex. 321 at LOA-00000221 |
| m | 2026LED-30K | Ex. 320 at LOA-00170931 |
| | | Ex. 321 at LOA-00000223 |
| | | Ex. 159 at LOA-00000810 |
| | | Ex. 159 at LOA-0000763 |
| | | Ex. 159 at LOA-00000764 |
| | | Ex. 159 at LOA-00000802 |
| | | Ex. 289 at FTC00151 |
| | | Ex. 159 at LOA-00000811 |
| | | Ex. 159 at LOA-00000777 |
| | | Ex. 289 at FTC00141 |
| | | Ex. 320 at LOA-00170944 |
| | | Ex. 321 at LOA-00000228 |
| | | Ex. 321 at LOA-00000224 |
| n | 2026LED-65K | Ex. 320 at LOA-00170932 |
| | | Ex. 321 at LOA-00000226 |
| | | Ex. 159 at LOA-00000773 |
| | | Ex. 159 at LOA-00000778 |
| | | Ex. 289 at FTC00139 |
| | | Ex. 289 at FTC00140 |
| | | Ex. 320 at LOA-00170945 |
| | | Ex. 321 at LOA-00000229 |
| | | Ex. 320 at LOA-00170954 |

FF

|  | Model No. | Deposition Exhibit and Bates No. |
|---|---|---|
|  |  | Ex. 321 at LOA-00000227 |
| o | 2035LED-30K | Ex. 289 at FTC00152 |
|  |  | Ex. 289 at FTC00153 |
|  |  | Ex. 320 at LOA-00170955 |
|  |  | Ex. 321 at LOA-00000230 |
|  |  | Ex. 321 at LOA-00000231 |
|  |  | Ex. 320 at LOA-00170956 |
|  |  | Ex. 320 at LOA-00170957 |
|  |  | Ex. 320 at LOA-00170958 |

(Stipulated Fact 23.)

C.      LOA's Replaces Watts Claims.

51.  For each of the following model numbers, LOA claimed that its LED lamp "replaces __ watts," ranging from 20 to 45 watts:  2001LED10-65K, 2001LED53IN-65K, 2001LED53OUT-65K, 2001LEDE26-65K, 2002LEDP30-65K, 2002LEDR30-65K, 2003LEDP38-65K, 2004LEDDL-35K, 2025LED-30K, 2025LED-65K, 2025LEDE12-30K, 2025LEDE12-65K, 2026LED-30K, and 2026LED-65K (the "Replaces Watts Lamps").  (Trial Exs. 159, 289, 320, 321.) The Court refers to these claims collectively as "Replaces Watts claims."

52.  For LOA's LED Lamp packaging with Replaces Watts claims, the only other light output information on the package was a statement that the LED Lamp produced either "warm white light" or "bright white light."  (Trial Ex. 159 (LOA-00000752-757, 759-775, 780-785, 788-789, 793-800, 802-05, 807-10), Trial Ex. 289 (FTC00114-117, 143), Trial Ex. 320 (LOA-00170921-932, 939), Trial Ex. 321 (LOA-00000199-204, 206-07, 213, 215, 220, 223, 226).)

53.  For LOA's LED Lamp packaging with Replaces Watts claims, LOA placed other information on the package related to energy use, energy savings, efficiency, and longevity.  (Trial Ex. 159 (LOA-00000752-757, 759-775, 780-785, 788-789, 793-800, 802-05, 807-10), Trial Ex. 289 (FTC00114-117, 143), Trial Ex. 320 (LOA-00170921-932, 939), Trial Ex. 321 (LOA-00000199-204, 206-07, 213, 215, 220, 223, 226)).)

54.  LOA distributed product brochures to some of its retailer customers from 2007 until at least August 2009.  (LOA Answer ¶ 17; Trial Ex. 582-LOA 2d Supp. Resp. Int. Nos. 2 and 7; LOA Depo. (Halliwell) 70.)

55.  In its product brochures, LOA referenced "Incandescent Comparison" claims, instead of the "replaces __ watts" claims.  (LOA Answer ¶ 17; Trial Exs. 154, 502.)

### 1.  The Timing of LOA's Replaces Watts Claims.

56.  LOA made its "replaces __ watts" claims on each of the Replaces Watts Lamps until at least February 2009.  (Trial Exs. 159, 245, 289, 320, 321.)

57.  Starting in February 2009, LOA gradually phased out the "replaces __ watts" claims on its packaging.  LOA did not print new packaging to remove the Replaces Watts claims until May 2009, at the earliest.  (Halliwell Depo. 158-160, 171:8-16.)

58.  Rather than use the Replaces Watts claims, LOA switched to claims stating the measured lumen output for its LED Lamps.  (Trial Ex. 580-LOA Resp. Int. No. 6.)

FF                                                     16

1    59.  LOA's process of a rolling change removing the "replaces __ watts"

2    claim took five to six months.  For example, LOA employees discussed on July 31,

3    2009 that LOA would stop shipping LED products with the Replaces Watts claims

4    until those claims could be covered by stickers.  As Mr. Halliwell confirmed, it

5    wasn't until May 2009 that large retailers such as Sam's Club and Costco received

6    packaging from LOA without the "replaces __ watts" claims, but it was September

7    2009 before all other retailers received the new labels.  (Trial Exs. 156, 172, 173;

8    Halliwell Depo. 171:8-16; Oct. 31 Trial Tr. (Halliwell) 79:16-82:13.)

9

10    60.  LOA did not instruct retailers or provide labels/stickers to retailers to

11   cover over the Replaces Watts claims on LOA's LED Lamps that were already on

12   the retailers' store shelves.  Even with big retailers such as Sam's Club and Costco,

13   Halliwell estimated that those retailers were selling LOA's Replaces Watts Lamps

14   in packaging that included the Replaces Watts claims until May or June 2009.

15   However, this depended on whether the stores were rotating their stock properly.

16   (Halliwell Depo. 159:20-160:8, 160:23-161:24; Oct. 31 Trial Tr. (Halliwell) 82:6-

17   13.)

18

19    61.  It was August 2009 before LOA ensured that the "replaces __ watts"

20   claims would no longer appear on any of LOA's LED Lamp packaging.  (Halliwell

21   Depo. at 171:8-23, 174:11-17.)  "We were still stickering in July."  (Id. at 174:17.)

22

23    62.  Since about August 2009, LOA had removed or covered the "replaces"

24   language from all its LED Lamps' packaging.  (Stipulated Fact 24.)

25

26    63.  LOA had a procedure for reviewing and approving, via dated,

27   handwritten signatures, packaging that would be used on LOA's LED Lamps.

28   LED Lamp labels with dated, hand-written signatures represents packaging that

FF                                      17

would be used on LOA's LED Lamps.  (Trial Ex. 159; LOA Depo. (Halliwell) 121:23-122:5, 122: 20-23, 144:18-25, 147:5-18.)

64.  Another group of LED Lamp labels that LOA produced to the FTC in response to the FTC's Civil Investigative Demand contains dates that indicate when LOA began using that label to sell its LED Lamps.  LOA inserted the dates indicated on these labels.  (Trial Ex. 289; LOA Depo. (Halliwell) 119:8-121:17.)

65.  The other two sets of LED Lamp labels that LOA produced do not contain the initials or signatures of LOA employees nor did LOA separately mark these labels with particular dates.  These LED lamp labels contain date codes printed on the labels themselves.  (Trial Exs. 320, 321; LOA Depo. (Halliwell) 206:20-207:24.)

66.  The date codes LOA embedded in its packaging are noted in parenthesis and are a combination of the week in the year plus the year.  For example, a date code of "(389)" equals the 38th week of 2009, or, roughly, September 14, 2009.  (Trial Exs. 320, 321; LOA Depo. (Halliwell) 206:20-207:24, 208:21-209:2.)

67.  Even though LOA modified its LED Lamps' packaging over time, LOA used a particular LED Lamp's label at least until it revised and produced a new label such that the oldest dated label represents the first label used for that model.  LOA used that label on packaging at least until LOA produced the next label to follow sequentially in time.

68.  As a result, evidence showing when LOA ceased making its Replaces Watts claims is found in its product packaging – when it changed from Replaces Watts to lumen output.  Thus, the first labels LOA produced with a lumen output

claim instead of a Replaces Watts claim is the best evidence of when LOA ceased making the Replaces Watts claims.

69.  There is insufficient evidence to conclude that prior to August 2009 all of its LED Lamps were sold in product packaging that either no longer contained the Replaces Watts claims or packaging on which it had covered over the Replaces Watts claims.

70.  The first product packaging LOA designed for the Replaces Watts Lamps that contained lumen output information instead of the "replaces __ watts" claim bears the following dates:

     a.    2001LED10-65K – April 14, 2009 (Trial Ex. 159, LOA-00000776);

     b.    2001LED53IN-65K and 2001LED53OUT-65K – August 24-31, 2009 (from date codes 359 (equals 8/24/2009) and 369 (equals 8/31/2009) (Trial Ex. 289, FTC00108, FTC00113; Trial Ex. 320, LOA-00170935, LOA-000170936; Trial Ex. 321, LOA-00000197, LOA-00000198);

     c.    2001LEDE26-65K – April 14, 2009 (Trial Ex. 321, LOA-00000779);

     d.    2002LEDP30-65K – September 1, 2009 (Trial Ex. 289, FTC00128);

     e.    2002LEDR30-65K – March 1, 2009 (Trial Ex. 289, FTC00142);

     f.    2003LEDP38-65K – March 1, 2009 (Trial Ex. 289, FTC00144)

     g.    2004LEDDL-35K – March 27, 2009 (Trial Ex. 159, LOA-00000799);

     h.    2025LED-30K – May 12, 2009 (Trial Ex. 289, FTC00132);

I.       2025LED-65K – May 12, 2009 (Trial Ex. 289, FTC00134);

j.       2025LEDE12-30K – February 1, 2009 (Trial Ex. 289, FTC00147);

k.       2025LEDE12-65K – May 12, 2009 (Trial Ex. 289, FTC00137);

l.       2026LED-30K – February 23, 2009 (Trial Ex. 289, FTC00151);

m.       2026LED-65K – May 12, 2009 (Trial Ex. 289, FTC00140).

(Trial Exs. 159, 289, 320, 321.)


71.  The best evidence before the Court shows that LOA ceased making its Replaces Watts claims on or before the dates indicated in fact **70** above. Thus, LOA sold its Replaces Watts Lamps with the "replaces ___ watts" claims through and including the months indicated for each lamp below:

a.       2001LED10-65K – April 2009

b.       2001LED53IN-65K and 2001LED53OUT-65K – August 2009

c.       2001LEDE26-65K – April 2009

d.       2002LEDP30-65K – August 2009

e.       2002LEDR30-65K – February 2009

f.       2003LEDP38-65K – February 2009

g.       2004LEDDL-35K – March 2009

h.       2025LED-30K – May 2009

I.       2025LED-65K – May 2009

j.       2025LEDE12-30K – February 2009

k.       2025LEDE12-65K – May 2009

l.       2026LED-30K – February 2009

m. 2026LED-65K – May 2009

(Trial Exs. 159, 289, 320, 321.)


2.   Consumer Confusion About LOA's Replaces Watts Claims.

72.  LOA learned that its "replaces ___ watts" claims were causing confusion among some consumers who purchased LOA's Replaces Watts Lamps by at least December 2008/January 2009.  (Halliwell Depo. 155:11-17, 156:18-24.)

73.  Consumers expressed "potential confusion over the use of the term 'replaces' indicating that the LED lamps produced the lumen equivalent of the compared incandescent bulbs."  (Trial Ex. 580-LOA Resp. Int. No. 6.)

74.  In late February 2009, Halliwell noted that consumers were confused about LOA's Replaces Watts claims in an email to Jim Brodrick at the DOE. (Trial Ex. 12, p. 2.)

D.     LOA Claims About Its Lamps' Light Output.

75.  Chingez Tarar, LOA's senior research engineer, evaluated the Replaces Watts claim and concluded it was a "deceptive claim" and "unsubstantiated." (Trial Ex. 158.)

76.  In fact, LOA's engineer in charge of LOA's LED Lamps had no involvement in the "replaces ___ watts" claims that appeared on LOA's packaging. (Oct. 31 Trial Tr. (Taj) 114:9-12.)

1.     LOA's Replaces Watts Lamps Did Not Provide the Same  or Comparable Light Output in Lumens as Incandescent Lamps.

77.  One can fairly compare the light output generated by a variety of lamp types using lumen output measurements.  In fact, objective photometric measurements can and should be used to substantiate LOA's "replaces ___ watts"

FF                                             21

claims.  (Houser,[5] ¶¶ 15, 39-49, 71-72; Oct. 30 Trial Tr. (Houser) 62:14-17, 77:20-
24.)

78.  Nothing about LEDs or LED lamps makes them unsuitable for or
incapable of measurement of overall light output in lumens.  (Houser,  ¶¶ 71-72;
Oct. 30 Trial Tr. (Houser) 72:9-15.)

79.  The DOE CALiPER "Round 6" tests were conducted on the following
LOA LED Lamps: 2001LED53OUT-65K-24, 2025LEDE12-65K-24,
2004LEDDL-35K-24 and 2003LEDP38-65K-8.[6]  (Stipulated Fact 37.)

80.  LOA's Replaces Watts Lamps produced markedly less light (in lumens)
compared to comparable incandescent lamps.  (Houser,  ¶¶ 45-49.)

81.  The typical lumen output range for a 45 watt incandescent lamp is 520-
870 lumens.  (Houser,¶ 46.)

82.  LOA made "replaces 45 watts" claims on the following lamps:
2002LEDP30-65K, 2002LEDR30-65K, 2003LEDP38-65K, and 2004LEDDL-
35K.  (Trial Exs. 159 (LOA-00000780, 783-87, 789, 793-94, 804, 807-08), Trial
Ex. 289 (FTC00125-26, 143),Trial Ex. 320 (LOA-00170925-27), Trial Ex. 321
(LOA-00000203, 205-06).)

---

[5]Dr. Kevin Houser was the FTC's technical expert.  LOA attacked Dr. Houser's
credentials prior to trial.  (Motion *in Limine*, Docket No. 240.)  The Court declined to exclude
Dr. Houser.  (Docket No. 262, pp. 8-9.)  LOA continues to advance the same arguments.  (LOA'
Proposed Findings of Fact ["LOAFF"], ¶¶ 279-90.)  (Similarly, LOA's Proposed Conclusions of
Law are referred to as "LOACL.")  Having considered his trial declaration and live testimony,
the Court found Dr. Houser technically competent and credible.

[6]See paragraphs 219 et. seq. regarding testing by th Department of Energy.

83.  Between August 2008 and September 2010, third party laboratories conducted photometric tests on the LED Lamps identified in the preceding paragraph.   Those tests provided the following lumen output measurements:

> a.  2002LEDP30-65K: 184-195 lumens;
>
> b.  2002LEDR30-65K: 172, 179-189, and 275 lumens;
>
> c.  2003LEDP38-65K: 122-177, 268-302, 282, and 416 lumens; and
>
> d.  2004LEDDL-35K: 140, 143, and 201 lumens.

(Trial Exs. 53, 54, 513-514, 518, 542-546, 548-551; Houser, ¶ 47.)

84.  None of the lumen output readings for the Replaces Watts Lamps in paragraphs 82-82 above equal the typical lumen output range for a 45 watt incandescent.  Even the lamp with the highest measured lumen output (2003LEDP38-65K at 416 lumens) provides only 48 % of the highest point in the range of typical lumen output, and 80 % of the lowest point in the range of typical lumen output.  Whereas the lamp with the lowest measured lumen output  (also 2003LEDP38-65K at 122 lumens) provided only 14 % of the highest point in the range of typical lumen output, and 23 % of the lowest point in the range of typical lumen output.  (Id., ¶¶ 45-47; Trial Exs. 53, 54, 513- 514, 518, 542-546, 548-551.)

85.  LOA's replaces 45 watts claims for the lamps identified in paragraph 82 above were false.  (Id., ¶ 45.)

86.  The typical lumen output range for a 40 watt incandescent lamp is 315-540 lumens.  (Id., ¶ 46.)

87.  LOA made "replaces 40 watts" claims on the following lamps: 2025LEDE12-30K, 2025LEDE12-65K, 2026LED-30K, and 2026LED-65K.  (Trial Ex. 159 (LOA-00000752-53, 761-68, 773, 795-96, 800, 802, 809-10), Trial Ex.

320 (LOA-00170928-32), Trial Ex. 321(LOA-00000210, 213, 215, 220, 223, 226).)

88.   Between December 2008 and September 2010, third party laboratories conducted photometric tests on the LED Lamps identified in the preceding paragraph.  Those tests provided the following lumen output measurements:

      a.  2025LEDE12-30K: 41, 66-67, 76, and 90 lumens;

      b.  2025LEDE12-65K: 67-90, 74, 104-108, and 113 lumens;

      c.  2026LED-30K: 42, 43, and 90 lumens; and

      d.  2026LED-65K: 84 lumens.

(Trial Exs. 52, 511, 515, 519, 552-561, 565-571; Houser, ¶¶ 47-49.)

89.   None of the lumen output readings for the Replaces Watts Lamps in paragraphs 87-88 above equal the typical lumen output range for a 40 watt incandescent.  The lamp with the highest measured lumen output (2025LEDE12-65K at 113 lumens) provides only 23 % of the highest point in the range of typical lumen output, and 36 % of the lowest point in the range of typical lumen output. Whereas the lamp with the lowest measured lumen output (also 2025LEDE12-30K at 41 lumens) provided only 8 % of the highest point in the range of typical lumen output, and 13 % of the lowest point in the range of typical lumen output.  (Houser, ¶¶ 45-47; Trial Exs. 52, 511, 515, 519, 552-561, 565-571.)

90.   LOA's replaces 40 watts claims for the lamps identified in paragraph 87 above were false.  (Houser, ¶ 45.)

91.   LOA made "replaces 20 watts" claims on LED Lamps 2001LED53-OUT-65K, 2001LEDE26-65K, and 2001LEDG53-65K.  (Trial Ex. 159 (LOA-

00000755-60, 771-72, 775), Trial Ex. 289 (FTC00114-16), Trial Ex. 320 (LOA-00170920, 922-23), Trial Ex. 321 (LOA-00000199-201).)

92.  In August 2008, September 2009, and September 2010, a third party laboratory conducted photometric tests on LED Lamp 2001LED53-OUT-65K, 2001LEDE26-65K, and 2001LEDG53-65K.  Those tests provided the following lumen output measurements:

        a.  2001LED53-OUT-65K: 26.8-29.9 lumens;

        b.  2001LEDE26-65K: 52, and 86-93 lumens; and

        c.  2001LEDG53-65K: 32 lumens.

(Trial Exs. 51, 517, 540, 541; Houser,  ¶ 47.)

93.  None of the lumen output readings for the Replaces Watts Lamps in paragraphs 91-92 above equal the typical lumen output range for a 20 watt incandescent.  The lamp with the highest measured lumen output (2001LEDE26-65K at 93 lumens) provides only 39 % of the highest point in the range of typical lumen output, and 60 % of the lowest point in the range of typical lumen output. Whereas the lamp with the lowest measured lumen output (2001LED53-OUT-65K at 27 lumens) provided only 11 % of the highest point in the range of typical lumen output, and 17 % of the lowest point in the range of typical lumen output.  (Houser, ¶¶ 45-47; Trial Exs. 51, 517, 540, 541.)

94.  LOA's replaces 20 watts claims for LED Lamps 2001LED53-OUT-65K, 2001LEDE26-65K, and 2001LEDG53-65K were false.  (Houser, ¶ 45.)

95.  When compared to comparable incandescent lamps, the light output claims LOA made for the Replaces Watts Lamps were false.  (Id., ¶¶ 45-49; Trial Exs. 51, 510, 517, 540, 541.)

96.  LOA's Replaces Watts Lamps did not provide sufficient light (in lumens) to be comparable to that of the incandescent lamps LOA claimed its lamps would replace, and as a result, LOA made false claims on the Replaces Watts Lamps.

97.  LOA claims that it did not market its LED lamp as general purpose lighting.  (Halliwell, ¶ 33.)   However, that did not limit the practical use of the LED lamps.  Moreover, whether labeled for decorative or complementary lighting or otherwise, the replacement representations are the same, and they were false.

2.  <u>LOA's Center Beam Candle Power Data Also Shows Its
Replaces Watts Claims Were False.</u>

98.  The light output of one of LOA's integrated LED Lamps with a directional beam can be compared to a filament lamp with a similar directional beam.  (Houser, ¶ 44.)

99.  In order to compare the light output of these types of lamps, one must use a combination of both beam angle measured in degrees and center beam candle power (CBCP) measured in candelas.  (<u>Id.</u>; Oct. 30 Trial Tr. (Houser) 84:22-85:18.)

100.  Comparisons of the CBCP of LOA's directional LED lamps to that of other directional lamps is fundamentally flawed if it does not consider beam spread, beam angle, or beam lumens.  (Houser, ¶ 55.)

101.  CBCP data is contained in photometric test reports from third party laboratories that tested some of LOA's LED Lamps.  (Trial Exs. 53-54.)

FF                                        26

102.   Comparing the CBCP of two of LOA's directional LED Lamps to those of a filament lamp with a similar beam angle shows that these LED Lamps produced only a small fraction of the light of comparable filament lamps. Specifically:

> a.   LOA LED Lamp 2003LEDP38-65K produced only between 12 % and 21% of the CBCP of comparable filament lamps produced by GE; and

> b.   LOA LED Lamp 2004LEDDL-35K produced 89% less CBCP than that of a comparable filament lamp produced by GE.

(Trial Exs. 53-54, 632; Houser, ¶¶ 56-58.)

103.   These two Replaces Watts Lamps did not provide sufficient light (in candelas) to be comparable to that of the incandescent lamps LOA claimed its lamps would "replace[]" and as a result, LOA made false claims on 2003LEDP38-65K and 2004LEDDL-35K.

104.   LOA offered evidence of the visual comparisons which Halliwell conducted and evidence of the results of a focus groups conducted at Wal-Mart. (LOAFF, ¶¶ 178, 181.)  LOA asserts that visual observations were truthful.  (Id., ¶ 185.)

105.   However, the Court was unable to come to like conclusions when visual comparisons were offered during the course of the trial.  (Oct. 30 Trial Tr. 65-71.)  Trial Exhibit 475 consisted of five pairs of incandescent lights and LOA LEDS claimed to be replacements for the wattage in the incandescent lights.  In several instances, Dr. Houser found the LED of equal or greater brightness.   He also remarked that his observation were affected by the manner in which the eye adapts, and those effects continued even when only a single pair was illuminated.

FF                                    27

(Oct. 30 Trial Tr. 65, 69-70.)   Further skewing the comparisons was the fact that LEDs presented were uncharacteristically highly directional, and Dr. Houser only addressed the lights from a position directly in front of him, or on axis.   (Oct. 30 Trial Tr. 70.)   This evidence does not change the conclusion that the Replaces Watts claims were false.  Moreover, the Court has previously found such subjective observational data inadequate substantiation.  (MSJ Order, pp.  7-9.)

106.  The Court finds that the lumens analysis which Dr. Houser used was scientifically sound.  Dr. Houser explained that the luminance analysis used by LOA's expert Dr. Ram S. Rosen was variable with line of sight and thus flawed.  (Houser, ¶ 66.)  He also explained the lack of scientific support for Dr. Ronen's criticism of the use of lumens as flawed.  (Id., ¶¶ 68-71.)  In particular, he explained the error in Dr. Ronen's use of the S/P ratio for adjusting data.  (Id., ¶ 69-70.)

E.      Consumer Harm Resulting from LOA's False and Deceptive Replaces Watts Claims.

107.  LOA made false and deceptive Replaces Watts claims on the Replaces Watts Lamps through and including the month identified in paragraph 71.a-m.

108.  During the time LOA made the false Replaces Watts claims, its gross sales for the Replaces Watts Lamps equaled:

      a.  2001LED10-65K – $250,729.80 (April 2009)

      b.  2001LED53IN-65K and 2001LED53OUT-65K – $134,206.44 (August 2009)

      c.  2001LEDE26-65K – $119,396.88 (April 2009)

      d.  2002LEDP30-65K – $239,829.46 (August 2009)

e.   2002LEDR30-65K – $540,628.47 (February 2009)

f.   2003LEDP38-65K – $2,470,580.43 (February 2009)

g.   2004LEDDL-35K – $1,893,174.00 (March 2009)

h.   2025LED-30K – $246,102.96 (May 2009)

I.   2025LED-65K – $217,123.08 (May 2009)

j.   2025LEDE12-30K – $3,644,867.64 (February 2009)

k.   2025LEDE12-65K – $210, 793.92 (May 2009)

l.   2026LED-30K – $177,846.84 (February 2009)

m. 2026LED-65K – $351,822.43 (May 2009)

(Kelly Rev., ¶¶ 8-17, 19-21; Trial Exs. 159, 289, 295-299, 320, 321; LOA Depo.
(Halliwell) 170:3-174:17.)

109.  Total sales for all of the items identified in the preceding paragraph
equals:  $10,497,102.35.

110.  Total sales, based upon LOA's wholesale price, for the Replaces Watts
Lamps through and including the dates indicated in paragraphs 71 and 108 above
constitutes a conservative estimate of the amount of restitution owed to consumers
who purchased these lamps.  That amount equals: $10,497,102.35

III.    LOA's False and Deceptive Lifetime Claims.

111.  According to LOA's President, Usman Vakil, substantiation requires
scientific data.  (U. Vakil Depo. 180:6-181:6.)

112.  Usman Vakil testified that he told his managers to "substantiate
everything."  (Id., pp. 47:7-12, 73:23-74:2; Nov. 2 Trial Tr. (U. Vakil) 40:8-22.)

113.  LOA made lifetime claims in marketing and selling the following lamps:  2001LED53IN-65K and 2001LED53OUT-65K, 2001LEDE26-65K, 2002LEDP30-65K, 2002LEDR30-65K, 2003LEDP38-65K, 2004LEDDL-35K, 2025LED-30K, 2025LED-65K, 2025LEDE12-30K, 2025LEDE12-65K, 2025TLEDE12-30K, 2026LED-30K, 2026LED-65K, 2035LED-30K (collectively, the "Lifetime Lamps").  (Trial Exs. 159, 289, 320, 321.)  The Court refers to LOA collective lifetime claims as "Lifetime claims."

A.    Timing of LOA's Three Lifetime Claims.

114.  From February 2008 until sometime in August 2009, LOA claimed on its LED Lamps' packaging that those LED Lamps had a 30,000 hour life. (Stipulated Fact 26.)

115.  In August 2009, certain LOA employees discussed the basis for reducing LOA's lifetime claims from 30,000 hours to 20,000 hours.  (Stipulated Fact 30.)

116.  By the end of August 2009, LOA reduced the lifetime claims on all of its LED Lamps' packaging to 20,000 hours.  (Stipulated Fact 31.)

117.  LOA further reduced its lifetime claims for its Lifetime Lamps to 12,000-15,000 hours in September 2010.  (Trial Ex. 580-LOA Resp. Int. No. 6.)

118.  All of LOA's lifetime claims noted above are specific, numerical claims about how long its Lifetime Lamps will last.

119.   When making its 30,000 hour lifetime claims, LOA also claimed its LED Lamp "lasts 15 times longer than 2,000 hour incandescent bulbs."  LOA made these claims based upon the same lifetime data LOA cites as substantiation for the lifetime claims.  (Halliwell, ¶93; Halliwell Depo. 140:4-19; LOA Answer ¶ 39; Trial Ex. 159 (LOA-00000752-53, 792, 795-96, 800, 802, 809-13), Trial Ex. 289 (FTC00132, 135-37, 142, 147-48, 151).)

120.   When making its 20,000 hour lifetime claims, LOA also claimed its LED Lamp "lasts 10 times longer than 2,000 hour incandescent bulbs."  (Halliwell ¶ 93; LOA Answer ¶ 39; Trial Ex. 289 (FTC00109, 112, 127-31, 138, 141, 149-50, 152-56), Trial Ex. 320 (LOA-00170933-34, 937-945), Trial Ex. 321 (LOA-00000195-96, 204, 207, 209, 212, 216, 221, 228-29).)

121.   When making its 15,000 hour lifetime claims, LOA also claimed its LED Lamp "lasts 7 times longer than 2,000 hour incandescent bulbs."  (Halliwell, ¶ 93; Trial Ex. 320 (LOA-00170946-51, 953-54), Trial Ex. 321 (LOA-00000208, 211, 214, 217-19, 224-25, 227, 230-31).)

122.   When making its 12,000 hour lifetime claims, LOA also claimed its LED Lamp "lasts 6 times longer than 2,000 hour incandescent bulbs."  (Trial Ex. 320 (LOA-00170952, 955-56), Trial Ex. 321 (LOA-00000222).)

B.     LED Lamps Compared to Other Lamp Types.

123.   LOA's LED Lamps could be employed in end-use applications where the quantity of light produced by its lamps matters.  (Houser, ¶ 17.)

FF                                     31

124.  LOA's LED Lamps are general replacement lamps and not limited to categories of accent, décor, or other types of lighting.  (Id., ¶¶ 75-79.)

125.  LEDs generally fail gradually over time, growing steadily dimmer rather than failing catastrophically.  (Stipulated Fact 2.)  Moreover, the particular application of a LED Light has no bearing on a lifetime claim, and is simply irrelevant.

126.  Conditions that affect the long-term performance of LEDs include the amount of current used and temperature.  (Stipulated Fact 4.)  Taj recognized this when he testified that how the LED performs in the lamp is important.  Taj has held this belief since he started as the head of LOA's LED lamp Engineering department.  (Trial Exs. 130, 139, 143; Oct. 31 Trial Tr. (Taj) 96:22-97:2.)

127.  LOA's engineers who worked on and developed its LED Lamps knew that current and temperature within the lamp can greatly impact the performance and longevity of the LEDs in an LED Lamp.  (Trial Exs. 127, 130, 139, 140, 143.)

128.  LOA understood the importance of testing integrated LED lamps to evaluate LED performance.  As Taj testified, what is important is how the LED performs in the lamp.  LOA acknowledged in its LED Lamp brochure that "because they are sensitive to thermal and electrical conditions, LEDs must be carefully integrated into lighting fixtures."  (Oct. 31 Trial Tr. (Taj) 96:22-24; Trial Ex. 502.)

129.  The various LED lamps LOA sold were not identical.  Across products and over time, the differences in LOA's LED Lamps include:  housings, current used to operate the lamps, number of LEDs used in the lamp, type of LED

used in the lamps, and the configuration of the LEDs within its lamps.  (Halliwell, ¶¶ 99, 148; LOA Depo. (Halliwell) 10:2-13:6; 13:13-21; Trial Exs. 141, 580 - LOA Resp. Int. No. 25, Trial Ex. 585 - LOA Resp. Int. Nos. 35-37.)

130.  Some of those revisions were prompted by complaints about some of LOA's LED Lamps burning out partially or prematurely.  (Trial Ex. 141.)

131.  Due to the variations in the LED lamps LOA sold, its substantiation for a particular Lifetime Lamp must reflect the particular conditions present in that lamp.  (Oct. 31 Trial Tr. (Houser) 53:16-54:23.)

132.  Adequate substantiation for LOA's lifetime claims would be scientific or engineering data of LOA's integrated LED Lamps indicating that the lamps would last at least as long as the hours stated on the Lifetime Lamps' packaging.

B.      The Lighting Community's  Knowledge About LED Lamps.

133.  By the time LOA began to sell its LED Lamps, although there was not single standard, the lighting community had widely adopted $L_{70}$ to define when LED Lamps reach the end of their useful lives.  (Trial Ex. 35; Houser, ¶¶ 17, 35, 73.)

134.  LOA offered evidence that life time testing standards were in flux between 2007 and 2012.  ( LOAFF, ¶¶ 206-227, 331-37.)  This includes statements that there were no commonly accepted criteria.  (Id., ¶ 121.)  Nevertheless, the Court finds that Dr. Houser's use of the $L_{70}$ standard has support in the literature even if there was no settled way to test, as demonstrated by LOA's own citations.

(See id., ¶¶ 219, 221.)  However, the lack of standards begs the issue because LOA had no scientifically valid data on any basis to support its lifetime claims.

135.  $L_{70}$ is the point at which the light output of an LED lamp diminishes to seventy % of its original light output.  (Trial Ex. 35; Houser, ¶ 18.)

136.  $L_{50}$ is the point at which the light output of an LED lamp diminishes to fifty % of its original light output.  (Trial Ex. 35; Houser, ¶ 18.)

137.  Because LOA's LED Lamps could be used for general lighting applications, $L_{70}$ is the proper mark for the end of an LED lamp's lifetime, not $L_{50}$. (Houser, ¶¶ 17-18, 73-79; Oct. 31 Trial Tr. (Houser) 13:24-16:7.)  Again, the specific application is irrelevant to a lifetime claim.

138.  Since LOA's LED Lamps could be employed in end-use applications where the quantity of light matters and the LED Lamps were not limited to the narrow category of décor lamps, $L_{70}$ is the proper measure of when  LOA's LED Lamps reached the end of their lives.  (Houser, ¶¶ 17-18, 73-79; Oct. 30 Trial Tr. (Houser) 111:13-22; Oct. 31 Trial Tr. (Houser) 13:20-16:7.)

139.  LOA's employees most familiar with LOA's lifetime claims, however, do not agree on what defined the end of life for LOA's LED Lamps.  According to Halliwell, it was zero light output from the LEDs. Taj claims he defines life as $L_{50}$. By LOA's own definition, it was mean time before failure – the point at which half the tested sample size fails, meaning zero light output.  (Halliwell  Depo. 215:24-216:24, 219:1-5; Taj, ¶ 31; LOA Depo. (Halliwell) 246:3-248:16; Oct. 31 Trial Tr. (Halliwell) 82:14-88:20.)

140.  To the extent LOA and its employees determined the end of the LED Lamps' useful lives occurred at $L_{50}$, the point at which the lamps emitted no light, or based upon mean time before failure, LOA acted unreasonably and in disregard to the lighting community's consensus on the issue.

141.  To have adequate substantiation, LOA needed to measure and record the light output of its Lifetime Lamps so it could determine when each lamp's lumen maintenance dropped by thirty %.  (Oct. 31 Trial Tr. (Houser) 49:17- 50:23; Nov. 2 Trial Tr. (Houser) 15:10-16:23.)

142.  Although not as good of a measure of the lamp's lifetime, LOA could have drawn inferences from data it received about the lumen depreciation of the LEDs used in its LED Lamps.  (Houser, ¶ 85.)

143.  At a minimum, LOA's lumen depreciation evidence (from scientific tests conducted on the LEDs used in its LED Lamps) must replicate the conditions found in its integrated LED Lamps.  (Oct. 31 Trial Tr. (Houser) 53:16-55:7.)

144.  Although scientific data purporting to represent the lifetime and/or lumen depreciation evidenced in the LEDs used in LOA's LED Lamps is not adequate substantiation, the data is evidence of trends in the LEDs' performance is useful in assessing what other substantiation LOA should have requested and/or whether its lifetime claims were false.

C.    LEDs Used in LOA's Lamps.

FF                                    35

145.  LOA purchased LEDs from two different suppliers:  PARA Light Corp. ("Para Light") and Unity Microelectronics, Inc. ("Unity").  (Trial Ex. 584-LOA Resp. Int. Nos. 30-31.)

146.  The first of LOA's LED Lamps were all manufactured using Para Light LEDs.  LOA began to transition to Unity's LEDs sometime in or after October 2008.  (Halliwell, ¶ 70; Trial Ex. 584-LOA Resp. Int. No. 31, Trial Ex. 585 - LOA Resp. Int. Nos. 35-37.)

147.  LOA placed its last order for Para Light's LEDs in or about March 2009.  (Trial Ex. 584-LOA Resp. Int. No. 31.)

148.  Between October 2008 and March 2009, LOA used both Unity and Para Light LEDs in its LED Lamps.  (Halliwell, ¶ 70; Trial Ex. 584-LOA Resp. Int. No. 31, Trial Ex. 585 - LOA Resp. Int. Nos. 35-37.)

149.  LOA does not have any records showing which LED it used in which LED Lamp for a particular period of time during its transition from Para Light LEDs to Unity LEDs.  LOA has indicated that for virtually all of its LED Lamps, it used both Unity and Para Light LEDs during LOA's transition from Para Light to Unity.  (Trial Ex. 585-LOA Resp. Int. No. 37.)

D.    LOA Did Not Have a Reasonable Basis to Make Its Lifetime Claims.

150.  Prior to at least February 27, 2008, LOA had no life test data for Para Light's LEDs or for LOA's LED Lamps which incorporated Para Light's LEDs

when LOA began to market and sell its LED Lamps.  LOA has not identified any substantiation which pre-dates an email Taj received from LED supplier Para Light.  In making lifetime claims on the Lifetime Lamps prior to receipt of Para Light's email, LOA acted without any factual or reasonable basis.  (Houser, ¶ 81; Trial Ex. 583-LOA Resp. Int. No. 9.)

151.  LOA identified the following documents as substantiation for its lifetime claims:

a. Unity 5mm White Lamp Brightness Degradation Chart (Trial Ex. 290);

b. Unity LED Burn-in Life Summary, dated June 8, 2009 (Trial Ex. 291);

c. SGS Test Report, dated June 29, 2009 (Trial Ex. 301);

d. Unity Lights of America PAR38 Bulb Testing Report, dated August 5, 2009 (Trial Ex. 144);

e. Unity report regarding results of ongoing lumen depreciation study, dated August 9, 2009 (Trial Ex. 292);

f. OnSpex 1008 Hours – Lumen Depreciation Report, dated February 9, 2010 (Trial Ex. 294);

g. Testing and Inspection Reports (LOA-00000098 through LOA-00000297 and FTC00561 through FTC00662);

h. February 27, 2008 email from Para Light USA to Aijaz Taj (Trial Ex. 126);

i. Unity Reliability Test Report, received August 14, 2008 (Trial Ex. 400);

j. Unity Reliability Test Report, received December 4, 2008 (Trial Ex. 140); and

FF

k.  Test Reports by Lighting Sciences, Inc., dated September 25, 2009

(Trial Exs. 540-541).

(Trial Ex. 583-LOA Resp. Int. No. 9; LOA Depo. (Halliwell) 243:18-244:19, 249:14-250:11.)

152.  Usman Vakil acknowledged that manufacturing issues "resulted in product problems in the products sold."  Those manufacturing issues were related to LOA's LED Lamp lifetime claims.  According to Taj, the manufacturing issues "resulted in the products not performing as they were designed."  (U. Vakil, ¶¶ 32, 34, 36-37; Taj, ¶ 43.)

1.  <u>The Para Light Emails.</u>

153.  On February 27, 2008, Joe Chow of LOA LED supplier Para Light sent LOA engineer Taj an email that stated "We estimate our LED life is 30000 hr."  (Stipulated Fact 27.)

154.  Neither Para Light nor Joe Chow sent any life test data with the February 27, 2008 email.  At that time, LOA did not test its Lifetime Lamps to determine how long they would last.  (Trial Ex. 126; Oct. 31 Trial Tr. (Taj) 91:21-92:15, 97:19-98:3.)

155.  LOA did not have written documentation from Para Light that addressed the specific conditions such a drive currents, housings, heat sinks, or thermal conditions of each of its Lifetime Lamps.  (Trial Exs. 126, 130.)

FF                                                      38

156.  LOA relied on verbal communications from its LED supplier, Para Light, without any supporting documentation, as the basis for its lifetime claims for its LED Lamps.  (Oct. 31 Trial Tr. (Taj) 92:23-93:1, 95:21-96:21, 100:20-25, 145:14-146:6)

157.  LOA has not identified data specific to each of the Lifetime Lamps to support the claims made on each lamp.  (Trial Ex. 126; Houser, ¶¶ 82-83)

158.  LOA's reliance upon Mr. Chow's email, without further supporting test data, does not constitute a reasonable basis for its 30,000 hour lifetime claims generally, nor a reasonable basis for any or all of the Lifetime Lamps.  (Id., ¶¶ 82-83; Oct. 30 Trial Tr. (Houser) 200:7-201:1.)

2.  LOA's 2008 and Early 2009 Lifetime Data.

159.  In 2008, LOA relied on tests conducted on the LEDs that it used in its LED lamps in making performance claims on its LED Lamps' product packaging. LOA's witness summarized the chronology of LOA's receipt of its lifetime substantiation at its deposition.  (LOA Depo. (Halliwell) 150:4-151:14, 250:12-257:16, 258:15-260:9, 260:20-261:12.)

160.  LOA knew that the critical question to determine lifetime was how a supplier's LED behaves in LOA's lamp.  Nonetheless, prior to December 2008 LOA did not conduct tests to determine how much lumen depreciation suppliers' LEDs experienced in LOA's lamps.  (Oct. 31 Trial Tr. (Taj) 96:22-97:2, 104:7-13.)

161. After the Chow email, the next piece of data LOA had arrived on or about August 14, 2008 from LED supplier Unity. Unity sent LOA employees a Reliability Test Report. (Trial Ex. 400.)

162. In the Reliability Test Report, Unity presented measured data specific LED packages, not lamps, which had been tested for 1,008 hours. (Trial Ex. 400.)

163. Although of limited value because it is data from a test conducted only on the LED, the data does not support or provide a reasonable basis for LOA's lifetime claim because the amount of lumen depreciation that occurred during the test period was too great, even for the best performing LED tested. (Houser, ¶¶ 84-88.)

164. LOA has not provided sufficient evidence that the LEDs tested by Unity were those used in all of its Lifetime Lamps. Rather, its own list of the LEDs it used in its LED Lamps does not identify this Unity LED. (Trial Ex. 585- LOA Resp. Int. No. 35.)

165. Unity's Reliability Test Report does not support LOA's lifetime claims and does not suffice for a reasonable basis to make the claims on any of the Lifetime Lamps. (Houser, ¶¶ 84-88.)

166. Through at least August 2008, LOA lacked adequate substantiation for the 30,000 hour lifetime claim it made on the Lifetime Lamps. (Id.)

167. LOA then received preliminary test data for four of its LED Lamps: 2002LEDP30-65K, 2003LEDP38-65K, 2002LEDR30-65K, and 2025LED-65K.

FF                                            40

The data was sent to LOA by Unity and reflects a test period of 72 hours. Within that short time, the LOA LED Lamps tested showed lumen depreciation of 89.4 % to 74.8 %. (Trial Ex. 139; Houser, ¶ 89).

168. The data presented in Trial Ex. 139 shows poor lumen maintenance. This data is incompatible with a lifetime claim of 30,000 hours. (Houser, ¶ 89.)

169. Trial Ex. 139 also includes test data for one of Unity's LEDs. This data also reflects lumen depreciation tests conducted for 72 hours. (Trial Ex. 139.) The Unity LED test data shows rapid depreciation within the time period of testing − 5.3 to 8.3 %. The data also presents questions for LOA's engineers because the LED tested appears to experience less lumen depreciation at a higher temperature, which runs counter to the general theory that higher operating temperatures lead to worse lumen maintenance. At a minimum, LOA should have questioned this data. (Id., ¶ 90.)

170. The next piece of data is another test report from Unity titled Reliability Test Report. LOA employees received this report on or about December 4, 2008. (Trial Ex. 140.) The test data in Trial Ex. 140 reflects lumen depreciation tests conducted on four of LOA's Lifetime Lamps: 2002LEDP30-65K, 2003LEDP38-65K, 2002 LEDR 30-65K, and 2025LED-65K. (Trial Ex. 140; Houser, ¶ 91.)

171. When Taj received the data in Trial Ex. 140, he was concerned about the results, which showed three LOA lamps experienced 13 % lumen depreciation within the first 198 hours of the test period and lumen depreciation of 32-48 % within 961 hours. (Oct. 31 Trial Tr. (Taj) 110:9-112:14, 113:24-114:1.)

172.  Three of the four integrated lamps tested had reached the end of their useful lives within the 961 hour test period, under $L_{70}$.  (Trial Ex. 140; Houser, ¶ 91.)  The fourth had reduced to 78.0 % within 198 hours.  (Houser, ¶ 91.)

173.  Unity's test data in Trial Ex. 140 shows that none of the four lamps tested would last for 1,000 hours using $L_{70}$ as the end of life.  This data does not support LOA's 30,000 hour lifetime claim.  Rather, it shows the claim for the four lamps tested was false.  (Trial Ex. 140; Houser, ¶ 91.)

174.  None of the test data on four of LOA's Lifetime Lamps (2002LEDP30-65K, 2003LEDP38-65K, 2002 LEDR 30-65K, and 2025LED-65K) constitutes substantiation for any of the other Lifetime Lamps.  (Houser, ¶ 109.)

175.  Trial Ex. 140 also includes a test report for 1,008 hours of testing conducted on one of Unity's LEDs.  (Trial Ex. 140.)  The test report for this Unity LED shows the LED itself depreciated to 72.2 % of its original output within 1,008 hours of testing.  In almost reaching $L_{70}$ within 1,008 hours of testing, the test data does not support a lifetime claim for this LED of 30,000 hours.  This test data also shows that LOA's 30,000 hour lifetime claims for Lifetime Lamps that incorporated this particular LED were false.  (Trial Ex. 140; Houser, ¶¶ 92-93.)

176.  Although LOA had begun to transition to Unity LEDs in the Lifetime Lamps by the time LOA received Trial Ex. 140, not all of LOA's Lifetime Lamps were manufactured using the Unity LED tested in this exhibit.  (Trial Ex. 584-LOA Resp. Int. No. 31.)  Thus, the LED test data in Trial Ex. 140 does not constitute adequate substantiation for any of LOA's Lifetime Lamps.  (Trial Ex. 140, Trial

FF                                          42

Ex. 584-LOA Resp. Int. No. 31; Houser, ¶¶ 91-92, 101, 109; Oct. 31 Trial Tr. (Houser) 53:16-54:23.)

177. Although LOA's LED suppliers provided LOA with LED specifications, those specifications sheets did not identify the life of the LEDs in LOA's lamps. As Taj conceded, the suppliers' specification sheets do not actually specify the life claim of the LEDs used in LOA's LED Lamps. (Trial Ex. 143; Oct. 31 Trial Tr. (Taj) 92:8-15, 100:20-25.)

178. Trial Ex. 301 is the next piece of data LOA cited as supporting its lifetime claims. This document contains test reports from SGS, which are dated June 29, 2009. (Trial Ex. 301.)

179. Trial Ex. 301 contains test results from lumen depreciation tests conducted on four LEDs manufactured by Unity. Specifically, the LEDs tested were several of Unity's "A series" LEDs. (Trial Ex. 301; Houser, ¶¶ 96-97.)

180. Based upon the 1,000 hour test period, the amount of lumen depreciation that occurred in each of Unity's LEDs, and even assuming the rate of decline may improve, the data does not support even a 20,000 hour lifetime claim. (Trial Ex. 301; Houser, ¶¶ 96-97.)

181. Trial Ex. 301 does not provide scientific or engineering data which supports LOA's 30,000 hour, or its later 20,000 hour lifetime claim on its Lifetime Lamps. (Houser, ¶¶ 96-97.) As of the end of June 2009, LOA does not have a reasonable basis to make lifetime claims of 30,000 hours for its Lifetime Lamps. (Houser, ¶¶ 96-97.)

182.  The next documents LOA cites as substantiation for its Lifetime claims are Trial Exs. 290 and 291, which appear to be dated in or around the end of July or August 2009.  (Trial Exs. 290, 291.)  It is unclear whether Trial Exs. 290 and 291 reflect data derived from actual tests.  Further, the data appears to relate to LED data – not that of integrated lamps.  (Trial Exs. 290, 291; Houser, ¶ 98.)

183.  LOA has not provided sufficient evidence that the information contained in Trial Exs. 290 and 291 reflect measurements taken during a lumen depreciation test, that the items tested were either its LED Lamps or LEDs used in its lamps, or that the data directly relates to products it produced.  Given these deficiencies, Trial Exs. 290 and 291 do not provide scientific or engineering data which supports LOA's 30,000 hour, or its later 20,000 hour lifetime claim for any of its Lifetime Lamps.  (Trial Exs. 290, 291; Houser, ¶ 98.)

184.  The next document LOA cites as substantiation for its Lifetime claims is dated August 5, 2009 and is titled Unity Lights of America PAR38 Bulb Testing Report.  (Trial Ex. 144.)   Since Trial Ex. 144 reflects tests conducted on only one of the LED lamp types produced by LOA, it cannot constitute adequate substantiation for all of LOA's Lifetime Lamps.  (Houser, ¶ 109; Oct. 31 Trial Tr. (Houser) 53:16-54:23.)

185.  LOA received this test data around the same time as its employees were discussing a reduction of the lifetime claim to 20,000 hours.  (Trial Ex. 144; Stipulated Fact 30.)

186.  Trial Ex. 144 contains test data from 1,104 hours of lumen depreciation testing performed on two versions of LOA's PAR 38 LED lamp – one

FF                                          44

which incorporated Unity's "A series" LEDs and the other which incorporated Unity's "T series" LEDs.  However, the tests were performed at 18mA drive current, but LOA operated its LED Lamps at 20mA.  (Trial Ex. 144; Taj ¶ 65; Houser, ¶¶ 94-95.)

187.   The amount of lumen depreciation that occurred within the time period of tested (1,104 hours) does not support either LOA's 30,000 hour or its upcoming 20,000 hour lifetime claim for any of LOA's PAR 38 LED lamps.   Further, these tests cannot constitute substantiation for other lamp types included in the Lifetime Lamps.  (Trial Ex. 144; Houser, ¶¶ 94-95, 109; Oct. 31 Trial Tr. (Houser) 53:16-54:23.)

188.   Shortly after receipt of Trial Ex. 144, LOA's employees received information from Unity, which was identified in an email sent by Taj, dated August 9, 2009.  (Trial Ex. 292.)  In Trial Ex. 292, Taj states that Unity "simulated our Par 38 environment to extrapolate the following results."  Taj then lists three pieces of data which apply to 5mm LEDs.  Those data indicate that $L_{70}$ was reached at 10,000 hours.  (Trial Ex. 292.)

189.   The data Taj conveyed in Trial Ex. 292 contradicts LOA's lifetime claims of 30,000 and 20,000 hours.  (Trial Ex. 292.)

190.   LOA claims tests on its PAR 38 lamps represent the worst conditions or environment of its Lifetime Lamps.  However, test data on this one lamp type cannot constitute adequate substantiation for the other lamp types in the Lifetime Lamps.  Moreover, even if the data could be extended to other lamp types,  it does

FF                                              45

not support either LOA's 30,000 or 20,000 hour lifetime claims.  (Trial Ex. 292; Houser, ¶ 109.)

191.  It was not until late 2009 that LOA began to run lumen maintenance tests on its LED Lamps (internally or through a third-party laboratory).  In late 2009, LOA began to send its LED Lamps to a third party laboratory (OnSpex) for LM-80 lumen depreciation tests.  Prior to November 2009, LOA had not sent its LED Lamps to a laboratory for lumen depreciation tests.  (Vasquez, ¶ 10; Oct. 31 Trial Tr. (Vasquez) 153:25-154:3.)

192.  After LOA reduced its lifetime claims to 20,000 hours, it received lumen depreciation test reports from OnSpex.  (Trial Ex. 294.)

193.  The OnSpex tests were conducted on two of the Lifetime Lamps: 2025LEDE12-30K and 2026LED-30K.  The test reports indicate that these lamps were operated using 16mA, rather than the 20mA Taj identified as the current driving LOA's LED Lamps.  (Trial Ex. 294; Taj ¶ 65; Houser,¶ 100.)

194.  Tests conducted at a drive current different than that actually used in LOA's Lifetime Lamps cannot be used to support claims on lamps whose operating conditions – drive current – were different from those tested. (Houser, ¶ 100.)  This is particularly so where the drive current is <u>less</u> than actual operating conditions.

195.  The data presented in Trial Ex. 294 is limited.  Because the test period for these two lamps was only 1,008 hours, one cannot draw any reasonable

FF                                          46

conclusions as to whether these two lamps will meet LOA's 20,000 hour lifetime claim.  (Id.)

196.   Regardless of whether conclusions can be drawn on the two lamps tested, the data in Trial Ex. 294 cannot be used to support claims on Lifetime Lamps other than the two models tested (2025LEDE12-30K and 2026LED-30K).  Even then, the data does not replicate the conditions actually experienced in the two models tested so it does not constitute adequate substantiation for those two models either.  (Id.; Oct. 31 Trial Tr. (Houser) 53:16-54:23.)

197.   In November 2009, Halliwell received a report from Unity entitled "LED Burn-in and Life Extrapolation Summary."   (Halliwell, ¶ 180; Trial Ex. 287.)   For the Par38, one of the tables that states at 66.2 deg C, the $L_{70}$ time is 30,000 hours and the L50 time is 110,000 hours.  (Trial Ex. 287, p. 9).  While Dr. Houser validated the model used (Oct. 31 Trial Tr. 52-53), he provided a specific critique of the report in his written testimony.  (Houser, ¶ 99.)  First, the analysis was based on only 2,200 hours of measured data.  (Id.)  Second, the measured data show a much sharper decline than the extrapolated portion of the analysis.  For example, after 2,000 hours 25 % of the lumens had been lost.  (Oct. 31 Trial Tr. 23.)  Given this discrepancy, he did not believe that the overall conclusion with regard to $L_{50}$ and $L_{70}$ for single bulb being analyzed supported a 20,000 hour lifetime claim.  (Id.)  He found that the curve fitting work to create the extrapolations beyond the measured data "quite poor [with respect] to the real data," causing him to conclude that the extrapolated curves seemed "[v]isually . . . implausible."[7]  (Id.)  While the report might have provided Halliwell a subjective

[7]The Court gives little weight to the fact that Dr. Houser had done no research in extrapolation.  ( LOAFF, ¶ 403.)  Presentation of empirical data and drawing conclusions

basis for believing in the conclusions, they do not constitute objective scientific substantiation.

198.  LOA lacked a reasonable basis to make 20,000 hour lifetime claims on its Lifetime Lamps even as of February 2010.  (Id.)

199.  None of the documents identified above support any of LOA's lifetime claims (30,000 hours, 20,0000 hours, or 12,000-15,000 hours) for the Lifetime Lamps.  (Houser, ¶¶ 80-100.)

200.  Generally, the data LOA relies upon as its substantiation for the lifetime claims is inadequate for a variety of reasons, including:  most of the data represents tests conducted only on the LEDS, not the integrated LED Lamps; LOA does not rely on test data for each of the models of LED Lamps it produced; the tests were not run long enough to provide reliable, long-term data; and the test data for both LEDs and certain integrated LED Lamps consistently indicates lifetimes of no more than a few thousand hours.  (Houser, ¶¶ 17-24, 101-109.)

201.  Many of these problems were things LOA's engineers knew about.  For example, Chingez Tarar, a research and design engineer at LOA, knew of the importance of testing the integrated LED lamp.  He also recognized that not only should one study the LED itself, but one should then study how the LED behaves in the device.  (Oct. 31 Trial Tr. (Taj) 96:22-97:2, 142:17-143:18.)

202.  Tarar also noted that LOA should have test reports to support its claims from the LED supplier.  In order to do that, the LED supplier should have test

therefrom is part of the work of any scientist.

FF                                                    48

reports from a "third party laboratory" that "correlate with the claims being made by the vendor to LOA and LOA to the consumer." (Trial Ex. 304, p. 2.)

203. Ultimately, Tarar concluded LOA's 30,000 hour lifetime claim was unsubstantiated. (Trial Ex. 158.)

204. The documents which LOA identified, listed in paragraph 151, show that LOA could not reasonably make lifetime claims for the Lifetime Lamps in excess of 10,000 hours. (Houser, ¶¶ 17-24, 80-109.)

205. The findings in paragraphs 153-200 above show that LOA did not have engineering or scientific data to sufficiently support its lifetime claims, or any lifetime claims higher than 10,000 hours, at any point in time.

206. LOA points to the fact that Dr. Houser acknowledged that by 2009, 5mm LED manufacturers were routinely quoting lifetimes for 5mm LEDs of 50,000 hours. (LOAFF, ¶ 419, citing Oct. 30 Trial Tr. 149:14-18.) This is not scientific evidence to support LOA's claim for its own LEDs. LOA also points to a 2005 ASSIST report claiming that at three hours per day, LEDs would last 100,000 hours. (LOAFF, ¶ 410, citing Ex. 146.) Apart from the methodological problems which Dr. Houser pointed out ( Oct. 30 Trial Tr. 161-162),[8] the report does not speak to LOA's LEDs.

207. LOA lacked a reasonable basis for all the Lifetime claims it made on the Lifetime Lamps.

---

[8]He characterized the methodology as using a "strawman" to reach its conclusions. (Oct. 30 Trial Tr. 161-162.)

E.      LOA's Lifetime Claims Were Also False.

208.  LOA's substantiation does not support its 30,000 or 20,000 hour lifetime claims.  Rather, the documents and data LOA relies upon show that none of the LEDs or Lifetime Lamps tested would last beyond a few thousand hours. (Houser, ¶¶ 80-109.)

209.  The documents which LOA identified, listed in paragraph 151, also show that LOA's Lifetime claims on its Lifetime Lamps were false.

1.  LOA's Internal Lumen Depreciation Tests.

210.  LOA conducted a series of lumen depreciation tests through its Quality Control department starting in late 2009.  (Vasquez, ¶ 11.)

211.  Enrique Vasquez ("Vasquez") is the LOA employee who was in charge of the Quality Control department at that time.  Vasquez also supervised the lumen depreciation tests other members of his department conducted on the Lifetime Lamps.  (Vasquez, ¶¶ 5, 11.)

212.  LOA conducted its own lumen depreciation tests on the following lamps from October 2009 to April 2010:

        a.  2001LEDE26

        b.  2002LEDR30-65K

        c.  2003LEDP38-65K

        d.  2004LEDDL

        e.  2025LEDE12-30K A SERIES

FF

f.  2025LEDE12-65K CHINA A SERIES

g.  2026LED-65K Low Current A-Series

h.  2026LED-65K

I.  2026LED-30K

j.  2035LED-30K

k.  2025LED-65K LOW CURRENT

(Trial Exs. 520-29, 530-37; Vasquez, ¶ 12 (authenticating tests); Oct. 31 Trial Tr. (Vasquez) 175:25-178:16.)

213.  LOA conducted its internal tests for a minimum of 672 hours, and a maximum of 6,888 hours.  (Trial Exs. 520-537; Houser, ¶ 115.)

214.  LOA's internal tests show that for each of the lamps tested, the end of useful life (defined as $L_{70}$) was reached as of:

a.  2001LEDE26: 400-500 hours

b.  2002LEDR30-65K: 475-575 hours

c.  2003LEDP38-65K: 300-600 hours

d.  2004LEDDL: 825-950 hours

e.  2025LEDE12-30K A SERIES: 2000-2450 hours

f.  2025LEDE12-65K CHINA A SERIES: 175-1400 hours

g.  2025LED-65K (low current 0.56mf Cap): 1900-2900 hours

h.  2026LED-30K (low current A Series): 2100-2300 hours

I.  2026LED-65K Low Current A-Series: 1100-2900 hours

j.  2026LED-65K: 250-1025 hours

k.  2035LED-30K: 2850-3075 hours

(Trial Exs. 520-29, 530-37; Houser, ¶¶ 111.)

FF                                              51

215.  None of the lamps tested by LOA maintained lumen output above $L_{70}$ during the period tested.  All had reached the end of life under $L_{70}$ during the less than 7,000 hours of testing.  (Houser, ¶¶ 110-123.)

216.  The two best-performing lamps had lost 45 % of their original lumen output by the end of the 6,888 hour test period.  The maximum lifetime for any of the lamps LOA tested was 3,075 hours (2035LED-30K).  (Trial Exs. 513-15, 520-29, 530-37; Houser, ¶¶ 111, 115.)

217.  Although LOA claims it made continual improvements in its LED Lamps' designs over time, those improvements did not result in an increase in the lamps' lifetime.  (Trial Exs. 513-15, 520-29, 530-37; Houser, ¶¶ 110-123)

218.  LOA's internal tests show that any lifetime claims above a few thousand hours for its Lifetime Lamps were false.  (Houser,  ¶¶ 110-123.)

2.  Lumen Depreciation Tests Conducted by the Department of Energy.

219.  In addition to LOA's internal tests, several of its Lifetime Lamps were tested through the Department of Energy ("DOE") .  (Trial Exs. 15, 16, 513-15)

220.  DOE tested certain LOA LED Lamps through its CALiPER program prior to the filing of this action.  (Trial Exs. 15, 16, 513-15)  CALiPER is an acronym for Commercially Available LED Product Evaluation and Reporting Program.  (Stipulated Fact 33.)

221.  Pacific Northwest National Laboratory ("PNNL"), which did the Round 6 DOE CALiPER tests on LOA products, purchased the LOA products that were tested from Wal-Mart on July 29, 2008.  (Stipulated Fact 34; PNNL Depo. (Paget) 128:20-129:4.)  PNNL is operated by Battelle and is a contractor of the DOE.  (Stipulated Fact 35.)

222.  James Brodrick is the DOE person who oversaw PNNL's activities in connection with the CALiPER program.  (Stipulated Fact 36.)

223.  The DOE CALiPER program conducted lumen depreciation tests on ten samples each of LOA LED Lamp models 2002LEDR30-65K, 2003LEDP38-65K, and 2025 LEDE12-30K.  (Trial Exs. 15-16, 513-15; Paget Depo. 146:23-147:8; Houser, ¶ 118.)

224.  The CALiPER tests are sufficiently reliable to constitute evidence of the falsity of LOA's lifetime claims in this case.  The CALiPER reports are indicative of a product's performance.  (Trial Exs. 16, 513-15; PNNL Depo. (Paget) 29:3-16; Houser,¶¶ 117-123.)

225.  The CALiPER tests on these lamps show that none of the tested lamps' lifetimes exceeded 375 hours under $L_{70}$, or 600 hours under $L_{50}$.  (Trial Exs. 513-15; Houser, ¶ 117.)

226.  DOE sent a copy of the CALiPER test report, containing the results of lumen depreciation tests run on three of LOA's LED Lamps, to Usman Vakil in or about September 2009.  (Trial Ex. 580-LOA Resp. Int. No. 13.)

227.  The CALiPER tests show that LOA's lifetime claims of 30,000 hours on its LED Lamp models 2002LEDR30-65K, 2003LEDP38-65K, and 2025LEDE12-30K were false.  (Trial Exs. 16, 513-15; Houser, ¶¶ 117-123.)

228.  After receiving these results, Farooq Vakil sent a letter to the DOE in late September and requested that it re-test LOA's LED Lamps.  In October 2009, the CALiPER program acquired another ten samples of each of the lamps it previously tested.  (Trial Exs. 16, 27, 79.)

229.  In addition to the continuous burn lumen depreciation tests conducted in August 2009 and reported in the CALiPER September 2009 report, the CALiPER program also acceded to LOA's request to test its lamps' lumen depreciation using a rapid cycle test.  The different tests, however, did not result in different outcomes for LOA's lamps:

   a.  2002LEDR30-65K: the average lumen depreciation was greater than 50% in under 800 hours when operated continuously, and greater than 30% when cycled on and off;

   b.  2003LEDP38-65K: the average lumen depreciation was greater than 50% in under 800 hours when operated continuously, and greater than 40% when cycled on and off; and

   c.  2025LEDE12-65K: the average lumen depreciation was greater than 50% in under 600 hours when operated continuously and when cycled on and off.

(Trial Ex. 16, Figure 4.14.)

230.  The CALiPER re-test report stated:  "[w]hether operated continuously or in cycles, none of these lamps came close to achieving its advertised lifetime of 30,000 hours."  (Trial Ex. 16 at 4.22.)

231.  The Court notes the limitations on the CALiPER reports to which Dr. Houser agreed.  (E.g., Ex. 55; Oct. 30 Trial Tr. (Houser) 153:4-9.)   Dr. Houser used the data as a "component" of his work along with "a lot of internal Lights of America tests."  (Oct. 30 Trial Tr. (Houser) 154:18-23.)  Moreover, given that LOA acted on the basis of the reports, as noted below, they clearly have evidentiary value supporting a finding that LOA's Lifetime claims were false.

232.  LOA sent five samples of the same models for third party testing at the same time as the CALiPER tests.  The tests conducted by the third party laboratory, OnSpex, do not show more promising results for LOA's lamps.

> a. R30-6500K (LOA model number 2002LEDR30-65K): every sample tested showed lumen depreciation greater than 50% in less than 672 hours;
>
> b. PAR38 6500K (LOA model number 2003LEDP38-65K): every sample tested showed lumen depreciation greater than 50% in less than 672 hours;
>
> c. 1.5 Watt Candlabra (LOA model number 2025LEDE12-65K): every sample tested except one showed lumen depreciation greater than 30% in less than 1008 hours. Only one sample tested showed lumen depreciation greater than 25% in 1008 hours.

(Trial Exs. 576-578.)

233.  After LOA lowered its lifetime claims to 20,000 hours, the CALiPER program tested three of LOA's lamps.  Specifically, in August 2010, the CALiPER program tested LOA LED Lamps:  2001LEDE26-65K, 2002LEDP30-65K, and 2025LED-65K.  The test results for these three lamps show the same patterns as prior tests – none of them could meet a 20,000 hour lifetime claim. The results indicated:

      a.  2001LEDE26-65K: average lumen depreciation was 28% after 1000 hours;

      b.  2002LEDP30-65K: average lumen depreciation was 88% after 1000 hours;

      c.  2025LED-65K: average lumen depreciation was 58% after 1000 hours.

(Trial Exs. 517-519.)

234.  The only Lifetime Lamps that were not the subject of lumen depreciation tests conducted by either LOA or through the CALiPER program were the following models:  2001LED53-IN-65K, 2001LED53-OUT-65K, 2025LED-30K, and 2025TLEDE12-30K.

    F.    <u>LOA Received Consumer Complaints About Both of the Claims at Issue.</u>

235.  LOA received complaints from consumers who purchased numerous LOA LED Lamps.  (LOA Answer ¶ 32.)

FF                                56

236.  LOA used a database named Bridge Track Consumer Communications to track consumer complaints about its products starting in March 2009.  (Trial Ex. 580-LOA Resp. Rog. No. 12.)

237.  LOA produced portions of its Bridge Track Consumer Communications database reflecting consumer complaints about its LED Lamps to the FTC.  Those excerpts from LOA's Bridge Track database are contained in Trial Exs. 538 and 539.

238.  LOA's Bridge Track database included a field where the consumer or LOA could note the product number that was related to the consumer's feedback. (Trial Exs. 538 and 539.)

239.  In total, Trial Exs. 538 and 539 contain approximately 1913 different consumer communications about LOA's products. Of that number, 1087 entries (57 %) contain consumer complaints about the lifetime of LOA's LED Lamps. (Burton, ¶¶ 8-9.)

240.  In 2008, LOA received numerous consumer complaints about LOA's LED Lamps not lasting as long as advertised.  (E.g., Trial Ex. 183.)

241.  The complaints persisted in 2009.  In August of that year, Duane Shore and Joan Munoz (LOA's Director of Personnel and Operations) took a large stack of consumer complaints about LOA's products to Farooq Vakil.  (Trial Exs.165-66, 185-86, 189-90, 194, 232, 254.)

III.   **LOA Violated Section 5(a) of the FTC Act.**

242.  Defendants are aware of the importance of light output and lifetime claims on product packaging for light bulbs.  (LOA Answer ¶ 85)

243.  LOA did not have adequate substantiation for its Replaces Watts or lifetime claims, which were both specific, numeric claims that require scientific data.

244.  LOA's Replaces Watts and Lifetime claims were false.

IV.   **Usman and Farooq Vakil Had the Authority to Control and Sufficient
Knowledge of LOA's Deceptive and False Claims.**

A.   **The Vakil's Authority to Control.**

245.  Usman Vakil was responsible for the day-to-day operations of LOA. (U. Vakil Depo. 237:1-3; Nov. 2 Trial Tr. (U. Vakil) 40:4-7.)

246.  Usman Vakil set the basic policy at LOA to "substantiate everything." (U. Vakil Depo. 73:23-74:2; U. Vakil,¶ 23; Nov. 2 Trial Tr. (U. Vakil) 40:8-22.)

247.  Usman Vakil states he made the decision for LOA to enter into the LED business.  (U. Vakil, ¶ 16.)

248.  Farooq Vakil worked at LOA at all relevant times.  He retained his executive title and oversight of numerous departments at LOA even though he only worked part-time.  (F. Vakil, ¶¶ 7, 9.)

249.  LOA's organizational chart shows two positions at the top of all departments:  the President and the Executive Vice President.  The two individuals who hold those positions are Usman Vakil, and Farooq Vakil, respectively.  All other LOA employees report to one of the Vakils.  (Trial Ex. 244.)

250.  Usman Vakil conceded that as LOA's chief executive, he "certainly did" get involved with significant issues at the company.  He further admitted that he considered "the issue of substantiation of the company's product claims to be a significant issue."  (Nov. 2 Trial Tr. (U. Vakil) 50:20-51:9.)

251.  The Vakils had the authority to control any employee at LOA.  Farooq Vakil admitted that unless Usman Vakil directed him otherwise, there were no limitations on his ability to tell any LOA employees what to do.  (Trial Ex. 244; U. Vakil Depo. 57:14-58:13; Halliwell Depo. 53:9-25; Nov. 2 Trial Tr. (F. Vakil) 149:23-150:18.)

252.  As the individuals at the top of all management chains and sole owners of the company, nobody had greater authority to control LOA's activities than Usman and Farooq Vakil.

B.    Usman Vakil Knew or Was Recklessly Indifferent to the Nature of LOA's Representations.

FF                                              59

253.   Usman Vakil was at LOA's Walnut, California facility almost every work day and made daily rounds of the manufacturing operations at the facility. Specifically, he would "go on rounds to see the manufacturing, look at everything, what people are doing" and sometimes he would tell his managers "what is required."  In addition to his rounds, he maintained an "open door" policy that allowed employees to communicate freely with him.  (U. Vakil Depo. 47:24-48:18, 49:8-14, 51:2-15.)

254.   Usman Vakil testified that as LOA's chief executive, he "certainly did" get involved with significant issues at the company.  He further admitted that he considered "the issue of substantiation of the company's product claims to be a significant issue."  However, he denies any involvement prior to August 2009. (Nov. 2 Trial Tr. (U. Vakil) 50:20-51:9; U. Vakil, ¶¶ 26-29, 38.)

255.   Usman Vakil was actively involved in LOA's LED Lamp business. According to Halliwell, both Usman Vakil and Farooq Vakil were involved in LOA's LED business.  Both Usman and Farooq Vakil participated in meetings with LOA's employees about its LED Lamps.  (Halliwell Depo. 186:25-187:19, 364:5-13.)

256.   In fact, when asked who was involved with LOA's LED lamp products prior to August 2009, Farooq Vakil stated Usman Vakil along with LOA's LED Lamp engineers.  In addition, his brother stated that Usman Vakil is "very involved in every little facet" even when, according to Farooq Vakil, Usman Vakil has qualified people around him.  (Nov. 2 Trial Tr. (F. Vakil) 120:10-13; F. Vakil Depo. 166:3-12.)

257.  According to Farooq Vakil, Usman Vakil "is a manufacturing person." Moreover, he is "not a detailed person" and his approach when there is an issue is to tell employees "fix it."  (F. Vakil Depo. 64:5-9, 64:18-65:3.)

258.  In about 2007, Usman Vakil discussed with Halliwell and Taj, the head of research for LOA's engineering department, producing and selling LED lamps at LOA.  (U. Vakil, ¶ 19.)

259.  Based on his discussions with Halliwell and Taj, Usman Vakil made the decision for LOA to enter the LED lamp manufacturing business.  (U. Vakil, ¶¶ 16, 19.)

260.  When LOA first entered the LED lamp market Usman Vakil looked at competitor products and surveyed those products at retail stores.  (U. Vakil Depo. 85:14-86:4.)

261.  When setting prices for LOA's LED Lamps, Usman Vakil compared LOA's products to competitors Feit and TCP, who were making the same lifetime claims as LOA "putting down in some cases 30,000, 50,000, 100,000 hours."  In fact, as Halliwell testified, Usman Vakil and he discussed so many products that "we would be here a long time if I was to reference every product I've ever referenced to Usman."  (U. Vakil Depo. 131:21-132:5, 133:7-10; Halliwell Depo. 114:4-10.)

262.  Usman Vakil set the LED Lamps prices at the introduction of the lamps into the commercial market and thereafter at routine quarterly meetings with Halliwell.  Ultimately, decisions about LOA's LED products' net pricing was

FF

entirely up to Usman Vakil.  (U. Vakil Depo. 135:12-136:7; Halliwell Depo. 79:20-24, 80:5-81:4, 81:21-83:17, 85:1-10, 85:23-86:22.)

263.  In setting prices for LOA's LED Lamps, Usman Vakil made "watt to watt" and "lifetime to lifetime" claim comparisons" between LOA's and competitors' products.  (U. Vakil Depo. 131:21-132:5, 133:2-10; Halliwell Depo. 110:1-4, 110:14-111:10, 111:19-113:21; Nov. 2 Trial Tr. (U. Vakil) 38:2-40:3.)

264.  If there was an issue regarding an important customer such as Costco, it would be discussed with Usman Vakil.  In fact, regarding sales issues generally, Usman Vakil would meet with Halliwell about once a week.  (Halliwell Depo. 25:23-26:8; Oct. 31 Trial Tr. (Taj) 119:11-120:13.)

265.  Usman Vakil used his daily rounds to discuss LOA's problems with his employees.  (U. Vakil Depo. 236:12-14)  Usman Vakil likely saw that packaging as he made his rounds through LOA each day.

266.  Taj spoke with Usman Vakil almost every day at LOA.  In those conversations, Taj and Usman Vakil spoke about subjects such as LEDs, design, thermal management, and engineering matters, and the testing of Unity's LEDs.  (Oct. 31 Trial Tr. (Taj) 117:12-118:17, 121:16-18.)

267.  Taj discussed engineering problems related to LOA LED Lamps with Usman Vakil, including technical engineering and design questions, the pricing or the performance of the LEDs, and the reports, if they were negative.   Based on the evidence, the Court finds that Usman Vakil saw that packaging as he made his

rounds through LOA each day.   (Oct. 31 Trial Tr. (Taj) 117:12-118:17, 121:16-18.)

268.  Taj discussed with Usman Vakil specific engineering decisions related to LOA's LED lamps such as thermal management and the size or shape of the bulb.  (Oct. 31 Trial Tr. (Taj) 118:2-17.)

269.  Usman Vakil participated in certain meetings with Unity, one of LOA's LED suppliers.  Usman Vakil also set up a meeting with another LED supplier, Nichia, in July 2008.  (Oct. 31 Trial Tr. (Taj) 121:19-21, 139:6-11; Trial Exs. 133, 129.)

270.  According to Taj, someone would have discussed with Usman Vakil the need for LOA to conduct a complete redesign of a product it sold to Costco to address concerns about LOA's LED lamps burning out prematurely.  (Oct. 31 Trial Tr. (Taj) 120:14-121:15.)

271.  In fact, in 2008, LOA undertook such a redesign of one of its LED lamps that it sold to Costco to address concerns about LOA's LED lamps burning out prematurely.  (Trial Ex. 141.)

272.  Usman Vakil received  approximately ten to fifteen internal emails a day, and he testified that he at least read the text of emails that contained test data. (U. Vakil Depo. 53:9-11, 152:3-8.)

273.  Usman Vakil received a variety of important documents about LOA's LED Lamps over email, such as product brochures, test reports on components

FF                                        63

used in LOA's LED Lamps, test reports on selected LED Lamps, retailer complaints about LOA's LED Lamps, and reports of LOA Shanghai failing a factory audit conducted by Home Depot.  (Trial Exs. 140, 143, 153, 154, 231, 236, 237, 274, 500, 501, 502, 506.)

274.  Usman Vakil also received emails from LOA Shanghai about how to maintain a sufficient supply of LEDs so they could increase production.  (Trial Ex. 236.)

275.  Between October and December 2008, Usman Vakil received emails and became informed of the need for lumen maintenance testing for LOA's LED Lamps.  Even before that, as early as September 2007, Usman Vakil received information about Energy Star's program requirements for solid state luminaires, a category that includes LED lamps.  (Trial Exs. 160, 199, 237, 274, 283, 506.)

276.  At least as early as December 2008, Usman Vakil was aware that LOA decided not to perform lifetime testing even though it was selling its LED Lamps in packaging that contained lifetime claims.  (Trial Exs. 237 and 506.)

277.  That same month, LOA's employees informed Usman Vakil that LOA would only perform lifetime testing "once we are satisfied with the production quality to have reports on record. [sic]"  (Trial Ex. 506.)

278.  Usman Vakil never intervened to ensure that appropriate tests were obtained on LOA's LED Lamps.  Nor did Usman Vakil take action to halt LOA's claims even after receiving test reports that showed both that LOA's Lifetime claims were not substantiated and that they were false.

279.  Specifically, in December 2008, Usman Vakil received test results related to the performance of four of LOA's integrated LED Lamps.  Those tests showed all of the lamps had reached the end of their useful lives (under $L_{70}$) within the 961 hour test period.  This data not only shows LOA's 30,000 hour lifetime claim was not supported, but also that it was false.  Usman Vakil testified that he did not pay any attention to this report: "I did not go through these details."  (Trial Ex. 140; Houser,  ¶¶ 91-92; Nov. 1 Trial Tr. (U. Vakil) 179:17-181:21.)

280.  As a lighting engineer, Usman Vakil knew or should have known how to read and interpret the test data he received.  At a minimum, he admits that he understood the meaning of a "lumen intensity decay graph."  In addition, in October 2008, Halliwell sent an email to Usman Vakil stating that a 25,000 hour lifetime claim would require maintaining 91% of initial light output at 6,000 hours, and a 35,000 lifetime claim would require maintaining 94% of light output at 6,000 hours.  (U. Vakil Depo. 152:22-24; Trial Ex. 274.)

281.  Nevertheless, Usman Vakil continued to ignore the data presented to him.  In February 2009, he received emails claiming Unity had improved its LEDs – ones that LOA was about to purchase for its LED Lamps.  However, the test results attached to this email show that Unity's LED life (under $L_{70}$) was less than 10,000 hours when driven at the current found in LOA's LED Lamps.  Rather than support LOA's lifetime claims, these tests also show LOA's claims were false.  (Trial Ex. 143.)

282.  In about July 2009, Usman Vakil directed that replacement language be remove from LOA packaging after he received test reports from DOE on several

FF                                          65

of LOA's LED Lamps which called into serious question the veracity of LOA's claims on its LED Lamps.   (U. Vakil, ¶ 38.)

283.   The first communication from DOE to Usman Vakil arrived in September 2008.  In that package, Usman Vakil received a report from DOE's CALiPER program on four of LOA's LED Lamp models (2001LED53OUT-65K, 2025LEDE12-65K, 2004LEDDL-35K, and 2003LEDP38-65K), in which the claims LOA made on some of its LED Lamps were identified.  The report also included pictures of the packaging used for each of the models tested.  (Trial Exs. 51-54, 503.)

284.  Usman Vakil responded to the CALiPER report by sending a letter to the DOE on September 25, 2008.  (Trial Exs. 71, 504.)

285.  A year later, in September 2009, the DOE sent Usman Vakil a letter with CALiPER test reports that showed lumen depreciation of 70 % and greater for three of LOA's LED Lamps.  Specifically, the CALiPER reports indicated lumen depreciation of approximately 90 % for model 2025LEDE12-30K, 78 % for model 2003LEDP38-65K, and 70 % for model 2002LEDR-65K.  (LOA Answer ¶ 64; Trial Exs. 513-15.)

286.  While the 2008 and 2009 DOE reports for a limited number of LED Lamps cannot necessarily be extended to all LOA LED Lamps, they do contrast with LOA's absence of any full product line data.

287.  In December 2009, Halliwell informed Usman Vakil that, based on tests conducted by OnSpex on LOA's LED Lamps, "all 5mm lamps cannot have a rated life above 1000 hours."  (Trial Ex. 148.)

288.  Usman Vakil knew about LOA's Lifetime claims and the basis for those claims, which all showed that LOA lacked a reasonable basis to make all of its Lifetime claims and that the claims were false.

289.  Moreover, to the extent Usman Vakil claims that he never read the attachments which accompanied such a small number of daily emails, the Court is skeptical.  Moreover, if believed,  he acted with reckless indifference to the truth or falsity of LOA's claims.

290.  Usman Vakil failed to implement any procedures by which he could ensure that his employees followed his edict to "substantiate everything."  At trial, he conceded that the only steps he took to ensure product claims were substantiated was just to ask LOA's engineers.  He did not ask for documents to substantiate LOA's claims in the end of 2009.  (Nov. 2 Trial Tr. (U. Vakil) 40:8-22, 51:10-52:4.)

291.  Usman Vakil took no action in response to reports about both the poor quality of LED lamps produced in LOA Shanghai and a failed factory audit of that facility.

292.  The President of LOA Shanghai, Kamran Mirza ("Mirza"), discussed LOA Shanghai's operations with Usman Vakil. (Mirza Depo. 73:22-24.)

FF                                                    67

293.  Usman Vakil also had a live video feed to the LOA Shanghai plant in his office.  (U. Vakil Depo. 184: 21-185:5; Nov. 1 Trial Tr. (U. Vakil) 174:23-25.)

294.  Mirza and Usman Vakil received reports evidencing the poor quality of production of the LED Lamps at LOA Shanghai.  (Trial Exs. 149, 153, 231, 500.)

295.  One of those reports came from one of its largest retailers – Costco.  Usman Vakil received an email in December 2008 wherein various LOA and Costco employees discussed the problems a Costco inspector found at LOA's Shanghai factory where, at that time, all of LOA's LED Lamps were manufactured.  Those problems continued when Costco returned to re-inspect LOA Shanghai.  (Trial Exs. 149, 230, 231.)

296.  The problems with LOA Shanghai's manufacturing operations were so bad that Mirza stated in May 2009:  "I think we should not be in LED business because the way we are running the production is not suitable for LED operation."  Mirza went on to state that LOA Shanghai had "no clean room to produce LED product," that conditions in the plant were "like freeway one side next to production line and other side trash dumping area.  You name it every thing that makes LED's bad we have."  (Trial Ex. 150; Mirza Depo. 79:13-80:24.)

297.  In November 2009, Usman Vakil was informed that LOA Shanghai had badly failed a Home Depot audit and Home Depot's "LED program is on hold."  (Trial Ex. 153.)

298.  The quality control problems at LOA Shanghai caused LOA to cease almost all LED Lamp production at LOA Shanghai in late 2009.  (U. Vakil Depo. 185:20-24, 186:7-17.)

299.  Usman Vakil knew about quality control issues at LOA's Shanghai facility.  Nevertheless, he failed to take any actions to ensure the quality control problems did not result in false or deceptive claims on LOA's LED Lamp packaging.  (U. Vakil Depo. 183:24-184:6.)

300.  At no point prior to July 2009 did Usman Vakil take any actions to ensure that LOA had substantiation for the claims it made about its LED Lamps, or to remove claims from LOA's LED Lamp packaging.

301.  Within six months of the date LOA first began to sell its LED Lamps, Usman Vakil received an email containing complaints from one of LOA's largest customers – Costco.  He also received a copy of a complaint a consumer filed through LOA's web site to obtain a refund or replacement for the seven LED Lamps the consumer purchased that failed.  (Trial Exs. 253, 279.)

302.  The following spring, Usman Vakil received emails containing more complaints from some of LOA's other largest customers – Sam's Club and Walmart.  Many of those complained about LOA's LED Lamps burning out early or partially, sometimes within days.  (Trial Exs. 166, 186, 190, 232.)

303.  Finally, in July 2009, Usman Vakil admits that he learned about the DOE's concerns over LOA's Replaces Watts claims.  In response, Usman Vakil

FF                                                   69

instructed LOA's employees to remove the claim from all LED Lamp packaging. (U. Vakil, ¶ 38.)

304.   By the summer and fall of 2009, Usman Vakil was also aware of and approved over $1.5 million in refunds to Costco that Costco requested after receiving a copy of the CALiPER report that tested some of LOA's products. Some of the lamps tested were sold to and through Costco.  (Trial Ex. 650-U. Vakil Resp. Int. No. 23; Halliwell, ¶¶ 205-07.)

305.   From at least July 2009, Usman Vakil was fully aware of both the Replaces Watts and Lifetime claims LOA made on its LED Lamps' packaging. (Trial Ex. 650-U. Vakil Resp. Int. No. 8.)

306.   In addition, in August 2009, Usman Vakil was included in the email discussions that took place among LOA employees regarding the basis for reducing LOA's lifetime claims from 30,000 hours to 20,000 hours.  Those discussions included what the new lifetime should be and the fact that dropping the lifetime too low would be "detrimental to our current product placement."  They also included Halliwell's statements that LOA will "go with 20000 hrs until such time we conduct and complete life testing at which point we will adjust our life claims."  Thus, even the face of an admission that no tests had been performed, Usman Vakil did not call for LOA to cease making its Lifetime claims.  (Trial Exs. 145, 215.)

307.   At about the same time, Usman Vakil received an email from Halliwell in which he stated "we need all 5mm products on test as soon as possible."  Thus, it appears that even after becoming aware of LOA's misrepresentations, Usman

FF                                          70

Vakil allowed LOA to continue to make Lifetime claims for which it had no supporting test data.  (Trial Ex. 204.)

308.  Following LOA Shanghai's failed Home Depot factory inspection in 2009, Halliwell pressed Mirza to complete a response to the report so it could be delivered to Home Depot's buyer before a meeting Halliwell and Umsan Vakil had scheduled with Home Depot.  (Trial Ex. 152.)

309.  In December 2009, Usman Vakil and Farooq Vakil continued to receive customer comments about premature burn out of LOA's LED Lamps from retailers, such as Sam's Club.  (Trial Ex. 169.)

310.  Into April 2010, Usman Vakil was informed that LOA was changing the circuits on some of its 5 mm LED Lamps so it could achieve a life rating of 15,000 hours.  However, no test data was attached to that email to show LOA had obtained a reliable test result to show those LED Lamps could, in fact, achieve the stated lifetime, nor did the sender of the email (Halliwell) indicate that such testing was already in hand.  (Trial Ex. 164.)

311.  Usman Vakil admits he was aware of the lifetime claims LOA made on its LED lamp packaging in July 2009 and thereafter.  (Trial Ex. 650-U. Vakil Resp. to Int. No. 8.)

312.  Prior to July 2009, Usman Vakil was knew of or was at least recklessly indifferent to the truth or falsity of LOA's Replaces Watts and Lifetime claims.

FF                                          71

313.  In and after July 2009, Usman Vakil knew of LOA's misrepresentations in making the Replaces Watts claims.  In and after August 2009, Usman Vakil knew about LOA's Lifetime claims and the basis for those claims, which all showed that LOA lacked a reasonable basis to make all of its Lifetime claims and that the claims were false.

314.  The Court does not find credible the claim that Usman Vakil's management style insulated him from the misleading Replaces Watts claims and the misleading and unsubstantiated Lifetime claims.  (LOAFF, ¶¶ 497-506.) Given his involvement in the business, the Court does not believe that his reliance on Halliwell and Taj insulated him from the problems which were occurring.  (E.g., LOAFF, ¶¶ 508, 513, 514.)  The above findings indicate that Usman Vakil was receiving information that there were in fact problems with LOA's claims and its products. At a minium, Usman Vakil was reckless in not ensuring that the problems were addressed and that false Replaces Watts and Lifetime claims were corrected.

C.  Farooq Vakil Knew or Was Recklessly Indifferent to the Falsity of LOA's Deceptive Claims.

315.  Much of Farooq Vakil's argument that he not personally liable stems from a heart attack which he sustained in 1997.  (LOAFF, ¶ 12.)   To be sure Halliwell's duties expanded (id., ¶ 13), but Farooq continued to be involved in the business, at first working 15 to 18 hours a week until late 2010 or early 2011, and then 20-25 hours a week.  (Id., ¶ 12.)  As demonstrated below, he was far from an absentee owner.

FF                                                  72

316.   Farooq Vakil was actively involved in LOA's LED Lamp business. According to Halliwell, both Usman Vakil and Farooq Vakil are involved in LOA's LED business.  Both Usman and Farooq Vakil participated in meetings with LOA's employees about its LED Lamps.  (Halliwell Depo. 186:25-187:19, 364:5-13.)

317.   In September 2008, Farooq Vakil directed an LOA employee to discuss an extensive list of questions with Unity so LOA could be sure it was getting a quality product from Unity.  All of these questions were raised to prepare for a meeting with Unity the following month.  (Trial Exs. 132, 133; Nov. 2 Trial Tr. (F. Vakil) 80:22-82:5.)

318.   Prior to that meeting with Unity, Farooq Vakil sent an email describing a meeting he had with Taj about the circuit design used in some of LOA's LED Lamps.  Farooq Vakil's instructions were to examine the circuit design to determine whether it needed to be modified prior to product leaving LOA.  (Trial Ex. 135.)

319.   Farooq Vakil also received Unity's power point presentation that it intended to present during its meeting with LOA in October 2008.  (Trial Ex. 136.)

320.   Following his meeting with Unity, Farooq Vakil contacted Unity's representative directly to request that Unity examine the performance of LOA's circuits and make recommendations.  Farooq Vakil also received preliminary lumen depreciation data from a test Unity had begun at LOA's request.  He later received more data from Unity from that test, which is discussed more fully below. (Trial Exs. 137, 139, 140.)

321.  Farooq Vakil's claim that he was not involved in LOA's LED business during the period of time he was requesting reviews of technical items like LOA's LED circuit designs is not credible.

322.  Farooq Vakil received a variety of important documents about LOA's LED Lamps over email, such as product brochures, test reports on components used in LOA's LED Lamps, test reports on selected LED Lamps, and retailer complaints about LOA's LED Lamps.  (Trial Exs. 72, 74, 140, 165-166, 237, 283, 501.)

323.  Specifically, as early as the fall of 2007, Farooq Vakil received LOA's LED Lamp brochures, in which LOA made lifetime claims, incandescent watt comparison claims, and included pictures of the product packaging.  (Trial Ex. 501.)

324.  In addition, in October 2008, Farooq Vakil, like Usman Vakil, received an email from Halliwell stating that a 25,000 hour lifetime claim would require maintaining 91% of initial light output at 6,000 hours, and a 35,000 lifetime claim would require maintaining 94% of light output at 6,000 hours.  (Trial Ex. 274.)

325.  Farooq Vakil was aware of the need for lifetime testing for LOA's LED Lamps at least by October 2008.  Yet, at that time, Farooq Vakil was also aware that LOA was not performing lifetime testing even though it was selling its LED Lamps in packaging that contained lifetime claims.  (Trial Exs. 199, 237, 283.)

326. Then, in December 2008, Farooq Vakil received test results related to the performance of LOA's LED lamps, responded to the email he received and forwarded the test results to Usman Vakil. Those tests showed that all four of LOA's LED Lamps tested had reached the end of their useful lives (under $L_{70}$) within the 961 hour test period. This data not only shows LOA's 30,000 hour lifetime claim was not supported, but also that it was false. (Trial Ex. 140; Houser ¶¶ 91-92; Nov. 2 Trial Tr. (F. Vakil) 88:1-17.)

327. In September 2009, Farooq Vakil sent a letter to the DOE about another negative CALiPER report that included tests run on some of LOA's LED products. In that letter, Farooq Vakil acknowledged the CALiPER test report that LOA received in September 2008. This was part of his request for CALiPER to test new production models, rather than those purchased off the shelf through the CALiPER program. (Trial Exs. 72, 74.)

328. Farooq Vakil also knew LOA's LED Lamps were not performing up to their claims. In 2009, Farooq Vakil received complaints from the Walmart and Sam's Club buyers that LOA's LED Lamps were failing prematurely, and well before the 30,000 hours claimed. (Trial Exs. 165, 166.)

329. Prior to 2009, Farooq Vakil did not implement any procedures by which he could ensure that his employees followed Usman Vakil's edict to "substantiate everything." In fact, Halliwell, LOA's only other executive, did not know whether Usman and Farooq Vakil had put procedures into place to ensure that LOA's departments were supported both fiscally and with good personnel. (Halliwell Depo. 364:5-16.)

330.  Farooq Vakil had oversight of the Customer Service department, yet he never implemented procedures by which the employees in that department would inform him of the volume or type of complaints LOA was receiving from the customers who purchased LOA's products.  Rather, his message to the head of customer service is always the same, "Take care of it."  (F. Vakil Depo. 67:8-17; Nov. 2 Trial Tr. (F. Vakil) 92:1-94:11.)

331.  Nevertheless, LOA's customer service representative, on at least one occasion, took a large stack of consumer complaints about LOA's products to Farooq Vakil.  (Nov. 2 Trial Tr. (F. Vakil) 108:14-109:17.)

332.  Similarly, Farooq Vakil had oversight of the accounting department, yet he never implemented procedures by which the employees of that department would inform him of the amount or number of returns, warranty claims, or trends in retailer purchases of LOA's LED products.  (Trial Ex. 244.)

333.  In continuing to rely on Halliwell's ability to properly substantiate and make accurate claims on LOA's LED Lamps after receipt of data calling the veracity of LOA's claims into question constitutes reckless indifference to the truth or falsity of LOA's claims.

334.  In 2009, Farooq Vakil became very involved in LOA's LED lamp business.

335.  Halliwell requested that Usman and Farooq Vakil confer about a variety of quality control procedures and processes, which included some LED products.  (Trial Ex. 275.)

FF                                                    76

336.   In the spring of 2009, Farooq Vakil directed that LOA more robustly establish and outfit a quality control department – one that would include test equipment that it could use to measure the light output and lumen depreciation of its LED Lamps.  (F. Vakil, ¶ 31, Trial Exs. 233, 260, 272.)

337.   In March 2009, Farooq Vakil required LOA to perform more quality control and announced a new beginning with improvements for all LOA products, including LED products.  Those requirements reached LOA's engineers responsible for its LED Lamps as well.  (F. Vakil Depo. 59:15-25, 75:12-76:9; Trial Ex. 233; Nov. 2 Trial Tr. (F. Vakil) 96:2-98:5.)

338.   In addition, throughout 2009, Farooq Vakil established LOA-wide procedures in multiple areas, including sales and marketing and quality control.  (F. Vakil Depo. 181:10-182:24; Trial Exs. 151, 175, 259, 260, 272, 277.)

339.   However, as of April 2009, LOA was not performing quality control tests on components such as the LEDs it received from Unity – one of the procedures outlined by Farooq Vakil.  (Trial Exs. 151, 247.)

340.   Further, as of July 2009, Farooq Vakil was instructing an LOA LED engineer to learn how to properly design the product and that he needed to learn all about the LED itself.  Farooq Vakil even directed this employee to "information available on the Internet and literature" to determine how to properly design the LED lamp.  (Trial Ex. 248; Nov. 2 Trial Tr. (F. Vakil) 98:6-99:13.)

341.   Farooq Vakil even directed his assistant to obtain and provide a report of defective products that the Quality Control department identified.  The email

FF                                             77

indicates that one of LOA's engineers, Chingez Tarar, would be receiving these reports daily.  (Trial Ex. 224.)

342.  By at least June 2009, Farooq Vakil was fully involved in the marketing of all of LOA's products, including LEDs.  (Trial Ex. 272, 277.)

343.  For example, in June 2009, Farooq Vakil directed LOA employees in marketing and told LOA employees "it is time that we follow truth in advertising" on LOA packaging and LOA needed to have products tested and put on packaging only that which can be backed up with "hard results."  (F. Vakil Depo. 181:10-182:24; Trial Exs. 272, 277.)

344.  The following month, he directed Taj to "take charge of LED totally." Yet, a few days later, in response from a letter from Brodrick at DOE, Farooq Vakil sent a highly critical email to numerous LOA employees in which he stated: "I also need answers on what controls are in place for this not to happen.   This is criminal.  Either [c]ase I will actively pursue policies to stop this senseless crime from happening."  (Trial Exs. 155, 156.)

345.  By the summer and fall of 2009, Farooq Vakil was also aware of the fact that LOA was refunding Costco over $1.5 million.

346.  In September 2009, Farooq Vakil sent another highly critical email in which he complained about the rush in preparing certain LED Lamp packaging that caused errors on the labels. He stated "I want to insert some procedures immediately to never have a repeat of this."  (Trial Ex. 227.)

347.  The lack of policies created problems into October 2009 when Farooq Vakil complained of the lack of procedures to test products before making and shipping them out.  Specifically, he stated "I would like to see a written plan of how we will control these issues . . .."  However, he never followed up on his demands or inquired about the written plan he demanded.  (Trial Ex. 228; Oct. 31 Trial Tr. (Vasquez) 171:23-172:10, 175:3-12.)

348.  He again questioned whether LOA was performing the proper testing and quality control measures at the same time he questioned whether Unity had provided LOA with accurate lifetime data.  One of LOA's engineers also raised questions to Farooq Vakil about whether Unity even had the ability to run proper lifetime tests.  (Trial Exs. 246, 307.)

349.  Even as late as November 2009, Farooq Vakil commented on high rates of lumen depreciation experienced by some of LOA's LED Lamps that were tested in its Quality Control department.  Farooq Vakil noted that while LOA's LED Lamps' depreciated quickly, the LED lamps made by LOA's competitors "hardly depreciate after 500 hours (maybe a few lumens only)."  Farooq Vakil requested that LOA's Quality Control department conduct these tests on competitors' lamps.  (Trial Exs. 242, 264; Nov. 2 Trial Tr. (F. Vakil) 103:12-20, 106:12-25.)

350.  By at least July 2009, Farooq Vakil knew or should have known that LOA was making false and unsubstantiated claims about its LED Lamps' light output and lifetimes.

351.  As of August 2009, Farooq Vakil knew of and was involved in approving packaging claims on LOA's LED Lamps.  (Trial Exs. 207, 215, 272.)

352.  In August 2009, Farooq Vakil and LOA employees discussed the justification for changing LOA's lifetime claims from 30,000 to 20,000 hours. Those discussions also included Halliwell's statements that LOA will "go with 20000 hrs until such time we conduct and complete life testing at which point we will adjust our life claims."  This change, however, was not made based upon test data.  Yet, neither Usman or Farooq Vakil called for LOA to cease making its lifetime claims.  (Trial Exs. 145, 215; Oct. 31 Trial Tr. (Vasquez) 166:16-168:22; Nov. 2 Trial Tr. (F. Vakil) 107:4-108:9.)

353.  Farooq Vakil exercised his control by approving lifetime claims on LOA LED product packaging in August 2009.  (Trial Ex. 207.)

354.  Farooq Vakil was aware of the lifetime claims LOA made on its LED lamp packaging in July 2009 and thereafter.  (Trial Ex. 647-F. Vakil Resp. Int. Nos. 8 and 11.)

355.  However, the complaints continued.  In August 2009, Farooq Vakil identified "huge stacks of customer complaints" on LOA's LED products.  (Trial Exs.167, 194.)

356.  Usman Vakil and Farooq Vakil continued to receive customer comments about premature burn out from retailers, such as Sam's Club in December 2009.  Yet, at trial, Farooq Vakil could not recall whether he read the substance of the complaint.  However, given the title of the email conveying this

complaint (Sam's Club Buyer Comments – Not good Publicity), Farooq Vakil conceded this should have "tripped me" to read it in full.  (Trial Ex. 169; Nov. 2 Trial Tr. (F. Vakil) 109:18-110:18.)

357.  In early August 2009, Farooq Vakil knew that LOA was making lifetime claims without proper data.  In discussing LED lamp testing, he stated:  "It still does not make sense to put life rating on the package without having some method of supporting the claim… ."  Moreover, at trial, he conceded that the vendor's statement in Trial Exhibit 266 that was based on preliminary tests was not adequate to support a claim on LOA's packaging.  (Trial Ex. 266; Nov. 2 Trial Tr. (F. Vakil) 110:21-111:13.)

358.  From August 2009 through at least November 2009, Farooq Vakil sent emails to various LOA employees questioning the accuracy and substantiation for the Lifetime claims LOA made on its LED lamps, noting that LOA took "liberties on claims," admonishing employees to put "truth (certified) on the package, brochures [sic], and Web," and identifying packaging claims as "fabricated" and "exaggerated."  (Trial Exs. 257, 264, 267, 270, 271.)

359.  In addition, LOA's own Quality Control department had begun to test many of its LED Lamps by November 2009.  Farooq Vakil received copies of many lumen depreciation tests conducted by LOA's Quality Control department. The vast majority of those tests indicated that LOA's LED Lamps were reaching $L_{70}$ within the 1,000-hour test period.  (Trial Ex. 205; Oct. 31 Trial Tr. (Vasquez) 162:2-18.)  Yet, Farooq Vakil did not call for LOA to re-evaluate or cease making its then 20,000 hour lifetime claim.

360.  Into 2010, LOA's engineer Taj informed Farooq Vakil that Taj was still working to improve LOA's LED Lamp design to obtain a lifetime of 15,000 hours.  (Trial Ex. 265.)

361.  LOA had a disorganized operation in which the department responsible for receipt of complaints and defective products returned from through its warranty were not communicating with other departments that might be able to evaluate the defective products and fix problems with the LED Lamps.  Farooq Vakil recognized this when he announced the need for a point person for these types of things.  He also noted that LOA did not have procedures to test the quality of incoming components and raw materials.  (Trial Ex. 175; Oct. 31 Trial Tr. (Vasquez) 157:23-158:8, 172:3-17, 174:1-6.)

362.  Thus, prior to July 2009, Farooq Vakil took no actions to ensure that LOA had substantiation for the claims it made about its LED Lamps, or to remove claims from LOA's LED Lamp packaging.  Yet, absent contrary direction from Usman Vakil, Farooq Vakil had full authority to direct LOA's employees to obtain proper substantiation or to remove unsubstantiated or false claims.  (Nov. 2 Trial Tr. (F. Vakil) 149:23-150:18.)

363.  Prior to July 2009, Farooq Vakil was recklessly indifferent to the truth or falsity of LOA's Replaces Watts and lifetime claims.

364.  In and after July 2009, Farooq Vakil knew of, or was at least recklessly indifferent to, LOA's misrepresentations in making the Replaces Watts claims.  In and after August 2009, Farooq Vakil knew about LOA's Lifetime claims and the

FF                                    82

basis for those claims, which all showed that LOA lacked a reasonable basis to make all of its Lifetime claims and that the claims were false.

365.  While not a direct line manager working 40 hours a week, Farooq Vakil was exposed to the operational problems that affected LOA's Replaces Watts and Lifetime claims, and he was sufficiently informed to know what data LOA had to back up, or not back up, those claim.   These facts combined with he broad ownership and management authority make him responsible for LOA's actions.  At a minimum, he was reckless in failing to investigate further and act.

V.   <u>LOA Sold Over $20 Million in Deceptively-Advertised LED Lamps.</u>

366.  LOA produced sales records for certain of its LED Lamps for the years 2007-2011.  (Trial Ex. 581-LOA Supp. Resp. Int. No. 10; Trial Exs. 295-299.)

367.  The sales records LOA produced contain spreadsheets listing products sold by product number, by month, and by retailer.  (Kelly Rev., ¶ 4; Trial Exs. 295-299.)

368.  Based upon the stipulated facts regarding LOA's use of certain packaging and the claims made on those labels, and the additional evidence the FTC presented at trial, the Court finds LOA made deceptive and/or false claims on the following Replaces Watts Lamps through and including the month and year identified below:

      a.   2001LED10-65K – April 2009

      b.   2001LED53IN-65K and 2001LED53OUT-65K – August 2009

      c.   2001LEDE26-65K – April 2009

d.  2002LEDP30-65K – August 2009

e.  2002LEDR30-65K – February 2009

f.  2003LEDP38-65K – February 2009

g.  2004LEDDL-35K – March 2009

h.  2025LED-30K – May 2009

I.  2025LED-65K – May 2009

j.  2025LEDE12-30K – February 2009

k.  2025LEDE12-65K – May 2009

l.  2026LED-30K – February 2009

m. 2026LED-65K – May 2009

(Trial Exs. 159, 289, 320, 321.)


369.  LOA made deceptive and false 30,000 hour lifetime claims on its LED Lamps until at least August 2009.  It was not until the end of August 2009 that LOA removed all of its unsubstantiated and false Replaces Watts claims.  These two periods of false and deceptive claims overlap.  However, LOA did not sell all of the same LED Lamp models with false and deceptive Replaces Watts and lifetime claims.


370.  Only one Replaces Watts Lamp was not sold with a false and deceptive 30,000 hour lifetime claim:  2001LED10-65K.  LOA sold all other Replaces Watts Lamps with false and deceptive 30,000 hour lifetime claims


371.  Further, LOA made false and deceptive 30,000 hour lifetime claims on two lamps which it did not sell with the false and deceptive Replaces Watts claims: 2025TLEDE12-30K and 2035LED-30K.

FF                                                    84

372.  Thus, to calculate total consumer harm arising from LOA's sale of its LED Lamps with false and deceptive light output and 30,000 hour lifetime claims, the Court need only calculate the gross revenue earned by LOA for its sale of the Lifetime Lamps, and then add to that number the gross revenue for LOA's sale of the one Replaces Watts Lamp for which it did not make a 30,000 hour lifetime claim (2001LED10-65K).

373.  LOA's gross revenue for the period of time it sold Replaces Watts Lamp 2001LED10-65K with the false and deceptive Replaces Watts claims (through April 2009) is:  $250,729.80.  (Kelly Rev., ¶ 8; Trial Exs. 295-299.)

374.  LOA's gross revenue for the Lifetime Lamps through August 2009 (when it reduced its 30,000 hour lifetime claim to 20,000 hours) is: $17,869,239.12.  (Kelly Rev., ¶ 24; Trial Exs. 295-299, 469.)

375.  LOA's gross revenue for its sale of the Lifetime Lamps for the period of time it made 20,000 hour lifetime claims (September 2009 to August 2010) is: $3,045,852.15.  (Kelly Rev., ¶ 24; Trial Exs. 295-299, 469.)

376.  LOA's gross revenue for its sale of the Lifetime Lamps for the period of time it made 12,000 and 15,000 hour lifetime claims (September 2010 through at least April 2011) is:  $250,772.20.  (Kelly Rev., ¶ 24; Trial Exs. 295-299, 469.)

377.  LOA's total gross sales for all of its LED Lamps that it falsely and deceptively advertised through April 2011 equals: $21,165,863.47.  (Kelly Rev., ¶ 25; Trial Exs. 295-299, 469.)

FF                                                    85

378.  The Court finds that Kenneth H. Kelly, who presented the FTC's calculations, was well qualified to develop and present his analysis of sales of LOA products made on the basis of deceptive or unsubstantiated claims.  (Kelly Rev., ¶ 1.)  The Court further finds that his methodology was reasonable and consistent with the legal standard for the computation of equitable monetary relief.  (See Court's Conclusions of Law, ¶¶ 518-22, 53-37.)

A.     LOA Did Not Adequately Identify Refunds It Purportedly Provided to Consumers.

379.  LOA responded to a discovery request for it to identify the total number and dollar amount of refunds it issued or reimbursements or exchanges provided under its warranty by identifying the total number of "credits and allowances" it provided to retailers.  (Trial Ex. 582-LOA 2d Supp. Resp. Int. No. 17.)

380.  LOA testified that the "credits and allowances" it identified in its response to the FTC's Interrogatory No. 17 included items such as automatic refund credits and other automatic allowances built into retailer contracts.  These contractual credits do not represent dollars refunded to consumers who purchased LOA's deceptively advertised products.  (LOA Depo. (Halliwell) 180:9-182:14, 182:23-188:4, 191:1-193:21; Nov. 2 Trial Tr. (Clifton) 163:12-164:13, 167:15-168:6, 169:2-170:2, 174:12-175:2.)

381.  LOA proffered a witness, Kathy Clifton ("Clifton"), to attest to the number and dollar amount of refunds it provided to consumers.

FF                                        86

382.   The FTC issued specific document requests and interrogatories to LOA for it to identify the amount and number of refunds, exchanges, and warranty claims on its LED Lamps.  Two of those discovery requests sought information solely about refunds and exchanges for products sold through Costco.  (Trial Ex. 580-LOA Resp. Int. Nos. 16-17, Trial Ex. 645-LOA Resp. Req. for Prod. Nos. 8-10.)

383.   The exhibits and data that Clifton relies upon in Trial Exhibit 446 were all responsive to the FTC's discovery requests.  However, defendants did not provide this information to the FTC in discovery at all or in a timely manner prior to trial.  Thus, the Court excluded this evidence at trial.  Moreover, as the Court ruled at trial, LOA had failed to comply with the production requirements for compilations under Federal Rule of Evidence 1008, and the Court excluded Trial Exhibit 446, as well as Trial Exhibits 444 and 447.  (Nov. 1 Trial Tr. 47 (Ex. 446); id. 49 (Ex. 447); Nov. 2 Trial Tr. 157 (Ex. 444).)

384.   Much of LOA's evidence of the amount of refunds or credits it claims it issued to retailers was admitted at trial.  Clifton testified about a few of the summaries presented in her direct examination.  From her testimony on those summary exhibits which the Court admitted, it is evident that not all of the dollars she identifies as refunds represent dollars that actually reached consumers.  For example, the Costco charge-backs summarized in Trial Exhibit 443 include freight charges for returned product.  These do not represent funds provided to consumers. Moreover, her summary of some of LOA's contracts with large retailers include credits for things like sales commissions.  As Clifton admitted, these are not dollars that consumers received.  (Nov. 2 Trial  163:12-164:13, 167:15-168:6, 169:2-170:2, 174:12-175:2.)

385.  To the extent the FTC had any information from LOA regarding refunds issued to consumers, neither LOA or its witnesses identified the amount of purported refunds, credits, or warranty claims with sufficient specificity, and in the case of its response to the FTC's interrogatory on this subject, LOA identified contractual credits which do not represent dollars returned to consumers.

386.  LOA has not produced admissible evidence or sufficient evidence to identify how many refunds or exchanges of LED Lamps it provided to consumers under its warranty or the dollar amount associated with any purported exchanges or refunds.

387.  While the record presented a theoretical basis for credits against the damages claimed by the FTC, the combination of impermissible categories of credits and allowances and the Court's evidentiary rulings eviscerated the showing which LOA advanced through Clifton.  Thus, no reduction is appropriate.

388.  LOA has provided no evidence to show errors in the FTC's calculation of consumer harm.  In its Proposed Findings of Fact and Conclusions of Law, LOA points to no credits or allowances which it contends should be offset against gross revenues.  (LOACL ¶¶ 45-48.)

B.     LOA's Benefits Conferred Theory.

389.  LOA contends that no damages were sustained because the energy savings calculated by its expert A. Michael Cowley are likely in excess of $100 million.  (LOAFF, ¶ 478; Cowley, ¶¶ 87-103.)  Apart from the fact that the conferral of benefits is not legally cognizable (Court's Conclusions of Law, ¶¶

538-39)**,** Cowley overlooks the fact that consumers did not get what was represented, either I in terms of life or replacement equivalents.  Indeed, Cowley's calculations consistently assume a usage far below LOA's lifetime representations. (Cowley, ¶¶ 100, 104 (2,000 hours); ¶ 101 (4,000 hours); LOAFF, ¶ 490 (800 to 2,000 hours).)  Cowley's calculations prove that consumer were entitled to far more than they got even using his methodology.

390.  Any finding of fact more properly characterized as a conclusion of law fact shall be deemed so.

## CONCLUSIONS OF LAW

I.      Jurisdiction and Venue.

391.  The Central District of California has subject matter jurisdiction over the FTC's claims pursuant to 15 U.S.C. §§ 45(a) and 53(b), and 28 U.S.C. §§ 1331, 1337(a), and 1345.

392.  Venue in the Central District of California is proper under 15 U.S.C. § 53(b), and 28 U.S.C. § 1391(b) and (c).

393.  LOA's marketing, sale and offering for sale of its LED lamps were in or affecting commerce, as "commerce" is defined in Section 4 of FTC Act, 15 U.S.C. § 44.

II.   <u>Violations of Section 5(a)</u>

394.  Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a).  An act is deceptive if: (1) there is a representation, omission or practice; (2) that is likely to mislead consumers acting reasonably under the circumstances; and (3) the representation, omission or practice is material.  <u>FTC v. Stefanchik</u>, 559 F.3d 924, 928 (9th Cir. 2009); <u>FTC v. Gill</u>, 265 F.3d 944, 950 (9th Cir. 2001) [hereinafter <u>Gill II</u>]; <u>FTC v. Medlab, Inc.</u>, 615 F. Supp. 2d 1068, 1076 (N.D. Cal. 2009); <u>FTC v. Direct Marketing Concepts, Inc.</u>, 569 F. Supp. 2d 285, 297 (D. Mass. 2008) [hereinafter <u>Direct Marketing I</u>], <u>aff'd</u> 624 F.3d 1 (1st Cir. 2010) [hereinafter <u>Direct Marketing II</u>].

395.  In order to show that a representation, omission or practice is likely to mislead consumers acting reasonably under the circumstances, the FTC must prove either that LOA lacked a reasonable basis for its representations or that the representations were false.  <u>Medlab</u>, 615 F. Supp. 2d at 1079;  <u>FTC v. Pantron I Corp.</u>, 33 F.3d 1088, 1096 (9th Cir. 1994).

396.  To decide whether a defendant made certain representations or omissions, a court must first review the advertisements.  <u>See</u> <u>FTC v. Gill</u>, 71 F. Supp. 2d 1030, 1043-44 (C.D. Cal. 1999) [hereinafter <u>Gill I</u>], <u>aff'd</u>, 265 F.3d 944 (9th Cir. 2001).

397.  A particular advertising claim will be deemed to have been made if consumers, acting reasonably under the circumstances, would interpret the

statements to contain that message.  In re Kraft, Inc., 114 F.T.C. 40, 120 (1991),
aff'd, 970 F.2d 311 (7th Cir. 1992), cert. denied, 507 U.S. 909 (1993).

398.  Advertisements that are "capable of being interpreted in a misleading
way should be construed against the advertiser."  Gill I, 71 F. Supp. 2d at 1045-46
(quoting Resort Car Rental Systems, Inc. v. FTC, 518 F.2d 962, 964 (9th Cir.
1975)).

399.  The FTC is not required to show that every reasonable consumer
would have been, or in fact was, misled.  See Stefanchik, 559 F.3d at 929.

400.  The existence of some satisfied customers does not constitute a defense
under the FTC Act.  Id.

401.  The existence of a warranty and/or return policy is irrelevant to the
legal question of whether an advertiser violated Section 5(a).  Pantron I, 33 F.3d at
1103; FTC v. Cyberspace.com LLC, 453 F.3d 1196, 1201 (9th Cir. 2006).

402.  An advertisement is likely to mislead consumers acting reasonably
under the circumstances if the claim is false.  Medlab, 615 F. Supp. 2d at 1079; see
also Pantron I, 33 F.3d at 1096.

403.  A representation is also likely to mislead consumers acting reasonably
under the circumstances, and therefore is deceptive, if the advertiser lacks a
"reasonable basis" to support the claims made in the advertisement.  Pantron I, 33
F.3d at 1096; Thompson Medical Co. v. FTC, 791 F.2d 189, 193 (D.C. Cir. 1986);
Direct Marketing I, 569 F. Supp. 2d at 298.

404. Advertisers are required to have substantiation not just for express statements but for all reasonable interpretations of their advertisements. Federal Trade Commission, Policy Statement Regarding Advertising Substantiation 2–3 (1984), appended to In re Thompson Medical Co., 104 F.T.C. 648, 1984 FTC LEXIS 6, at *435-36 (Nov. 23, 1984), aff'd 791 F.2d 189 (D.C. Cir. 1986).

405. Defendants bear the burden of establishing what substantiation they relied on when they made the claims in their ads. FTC v. QT, Inc., 448 F. Supp. 2d 908, 961 (N.D. Ill. 2006), amended in part by 472 F. Supp. 2d 990 (N.D. Ill. 2007), aff'd, 512 F.3d 858 (7th Cir. 2008). The FTC then bears the burden of establishing that the defendant's substantiation is inadequate. Id.

406. The appropriate level of substantiation for an express or implied efficacy claim is determined by looking to the following factors: (1) the product involved; (2) the type of claim; (3) the benefits of a truthful claim; (4) the ease of developing substantiation for the claim; (5) the consequences of a false claim; and (6) the amount of substantiation experts in the field would agree is reasonable. In re Thompson Medical, 1984 FTC LEXIS 6, at *387.

407. In order to have a reasonable basis for the representation, the advertiser must have "some recognizable substantiation for the representation prior to making it in an advertisement." Direct Marketing I, 569 F. Supp. 2d at 298.

408. The type of advertising claim determines what constitutes a "reasonable basis" for the claim. Thompson Medical, 791 F. 2d at 194.

409.   Where an advertiser makes claims using specific figures or facts, a high level of substantiation, such as scientific or engineering tests, is required. Thompson Medical Co., 104 F.T.C. 648, 1984 FTC LEXIS 6, *387.

410.   Where advertisers "lack adequate substantiation evidence, they necessarily lack any reasonable basis for their claims." Direct Marketing II, 624 F.3d at 8.

411.   To determine whether the claim at issue is material, courts examine whether the representation is likely to affect a consumer's conduct. Direct Marketing I, 569 F. Supp. 2d at 299; Medlab, 615 F. Supp. 2d at 1081.

412.   Information about a product's purpose, safety, efficacy, or cost is material. Direct Marketing I, 569 F. Supp. 2d at 299 (citing Novartis Corp. v. FTC, 223 F.3d 783, 786 (D.C. Cir. 2000)).

413.   Express claims or deliberately made implied claims are presumed to be material. Pantron I, 33 F.3d at 1095-96; In re Thompson Medical, 1984 FTC LEXIS 6, at *373.

414.   Implied claims may be material when they address the central characteristics of the product or service offered. Kraft, 970 F.2d at 322; FTC v. Figgie Int'l, Inc., 994 F.2d 595, 603-04 (9th Cir. 1993) (finding that defendant "misled customers about the 'single most useful piece of information' they could have used").

## A.  LOA's Replaces Watts Claims Were Unsubstantiated and False.

415.  In making both the Replaces Watts and Lifetime claims, LOA made express claims using specific facts and figures.

416.  LOA's packaging shows it made the Replaces Watts claims on the Replaces Watts Lamps.

417.  The Court has already ruled that LOA's Replaces Watts claims were express, and therefore *per se* material.  Moreover, the Court ruled that even if they were implied claims, they were material because the claims relate to the efficacy of the product.  (MSJ Order, p. 7.)

418.  In addition, the Court has ruled that LOA did not have adequate substantiation at the time it made its Replaces Watts claims on the fourteen Replaces Watts Lamps.

419.  Thus, LOA made unsubstantiated claims in violation of Section 5(a) regarding the amount of light its LED Lamps would produce.

420.  LOA had its Replaces Watts Lamps tested to measure each of their lumen outputs.  Those tests show that LOA's Replaces Watts Lamps produced only a small fraction of the amount of light (in lumens) compared to incandescent lamps of similar wattage.

94

421.  For all of the Replaces Watts Lamps tested, the lumen output data shows that LOA made false claims about the amount of light its Replaces Watts Lamps would produce. Those lamps are:

    a.  "replaces 45 watts" – 520-870 lumens

        I.    2002LEDP30-65K: 184-195 lumens

        ii.    2002LEDR30-65K: 172-275 lumens

        iii.    2003LEDP38-65K: 122-416 lumens

        iv.    2004LEDDL-35K: 140-201 lumens

    b.  "replaces 40 watts" – 315-495 lumens

        I.    2025LEDE12-30K: 41-90 lumens

        ii.    2025LEDE12-65K: 67-113 lumens

        iii.    2026LED-30K: 42-90 lumens

        iv.    2026LED-65K: 84 lumens

    c.  "replaces 20 watts" – 156-240 lumens

        I.    2001LED53-OUT-65K: 27-30 lumens

        ii.    2001LEDE26-65K: 52-93 lumens

        iii.    2001LEDG53-65K: 32 lumens.

422.  As a result, LOA violated Section 5(a) of the FTC Act by making false claims about the amount of light the Replaces Watts Lamps identified in paragraph 421a through c above would provide to consumers who purchased them.

**B.**    <u>LOA Made Unsubstantiated and False Lifetime Claims.</u>

423.  LOA's packaging (Trial Exs. 159, 289, 320, 321) shows it made the Lifetime claims on the Lifetime Lamps.  In fact, LOA has conceded it made the Lifetime claims. (Stipulated Facts 26, 31.)

424.  Like the Replaces Watts Claims, LOA's Lifetime claims are express claims that LOA made using specific facts and figures.

425.  A reasonable consumer would interpret LOA's Lifetime claims to mean that LOA's Lifetime Lamps would last for the number of hours stated on the package (i.e. 30,000 hours, 20,000 hours, or 12,000-15,000 hours).

426.  LOA's Lifetime claims were material both because the claims were express, and because the claims concerned the efficacy of LOA's LED Lamps.

427.  In order to have adequate substantiation, LOA must have scientific or engineering data to support its lifetime claims of 30,000 hours, 20,000 hours, and 12,000-15,000 hours.

428.  According to the FTC's expert, Dr. Houser, the definition for the end of LOA's Lifetime Lamps' useful lives is the point at which the lamps' light output diminishes to seventy % of its original output – a point that is called $L_{70}$.

429.  Prior to at least February 27, 2008, LOA had no scientific or engineering data to support any lifetime claim.  Thus, LOA lacked any substantiation for all of the lifetime claims it made on the Lifetime Lamps sold prior to February 27, 2008.  (Houser, ¶ 81.)

430.  Until at least August 2008, the only substantiation LOA cites for its Lifetime claims on its lamps is a one line email from one of its LED suppliers, Para Light.  This email stating an estimate of the supplier's LED's lifetime is not scientific or engineering data.  (Id., ¶¶ 82-83.)

431.  LOA's reliance upon this one line from Para Light does not constitute a reasonable basis for its 30,000 hour lifetime claims on its Lifetime Lamps.  Thus, all Lifetime Lamp sales prior to August 2008 were made with unsubstantiated claims.  (Id., ¶¶ 82-83.)

432.  From approximately August 2008 to the end of June 2009, LOA relied upon a mix of test data reflecting tests conducted on both LEDs and some of its Lifetime Lamps.

433.  None of the LED or integrated lamp lumen depreciation tests support a lifetime claim of 30,000 hours under $L_{70}$, which is the appropriate marker for the end of life for LOA's Lifetime Lamps.  (Id.,  ¶¶ 84-97, 109.)

434.  None of the LED test data supports LOA's 20,000 hour lifetime claims.  Test data from Unity shows that the amount of lumen depreciation experienced by the LEDs tested was too great to substantiate a 20,000 hour lifetime claim.  (Id., ¶ 98.)  Another test report from Unity indicates that its LED depreciated to 72.2 % of its original light output within 1,008 hours of testing. (Trial Ex. 140; Houser,  ¶¶ 91, 109-110.)  This data does not support LOA's 30,000 hour lifetime claims, either.

435.  For the specific models tested in this time period, none of the tests support a lifetime of either 30,000 or 20,000 hours.  Specifically, three of the four the models tested (2002LEDP30-65K, 2003LEDP38-65K, 2002 LEDR 30-65K, and 2025LED-65K ) reached the end of their useful lives (as defined by $L_{70}$) within the 961 hour test period.  (Houser,  ¶¶ 91, 109.)  The fourth had reduced to 78.0% after 198 hours.  (Id., ¶ 91.)

97

436.  Even if the test results were favorable, test data for one integrated Lifetime Lamp is not substantiation for other types of Lifetime Lamps.  LOA cannot extrapolate tests conducted on specific integrated Lifetime Lamps to other Lifetime Lamps that differ in lamp type.  (Id., ¶¶ 91, 109.)

437.  Thus, LOA made unsubstantiated Lifetime claims on its Lifetime Lamps through at least the end of June 2009.  (Id., ¶¶ 91, 109.)

438.  The final pieces of substantiation that LOA relies upon to support its Lifetime claims are tests conducted on two of its Lifetime Lamps (2025LEDE12-30K and 2026LED-30K).  (Id., ¶ 100.)

439.  The tests conducted on these two models did not represent the actual operating conditions present in those lamps as they were sold to retailers and consumers.  Moreover, the tests do not constitute proper substantiation for the two models at issue (2025LEDE12-30K and 2026LED-30K).  (Id.)

440.  These tests cannot form a reasonable basis for Lifetime claims on any of the other Lifetime Lamps.  (Id.)

441.  LOA has no other substantiation to support its Lifetime claims of 30,000 hours, 20,000 hours or 12,000-15,000 hours after June 2009.  Thus, it has no reasonable basis to make any of its lifetime claims after June 2009.

442.  LOA does not and did not have sufficient scientific or engineering tests to support its lifetime claims of 30,000 hours, 20,000 hours, or 12,000-15,000 hours.  (Id., ¶¶ 80-100.)

443.  LOA lacked a reasonable basis for all of its Lifetime claims.  Thus, LOA made unsubstantiated claims on its Lifetime Lamps in violation of Section 5(a).

444.  The information LOA relies upon as substantiation also shows that its Lifetime claims on the Lifetime Lamps were false.  All of the data LOA relies upon contradicts its Lifetime claims.  Thus, LOA's own substantiation is evidence of the falsity of its Lifetime claims.  (Id., ¶¶ 80-100.)

445.  In addition, LOA's own internal tests show that all of the Lifetime Lamps it tested would reach the end of their useful lives ($L_{70}$) well within 7,000 hours.  LOA's best performing lamp had a maximum lifetime (under $L_{70}$) of 3,075 hours.  (Id., ¶¶ 110-23.)

446.  LOA claimed it was continually making improvements in its LED Lamps to increase light output and lifetime.  Thus, the lamps LOA tested starting in October 2009 were better performing lamps than those it produced in 2008, or even earlier in 2009.

447.  LOA's own internal tests show that all of its Lifetime claims were false.  LOA's own data indicates that LOA's Lifetime Lamps did not last more than 3,000 hours – an amount not much greater than the average incandescent lamp.  (Id., ¶¶ 110-23.)

448.  In addition, the DOE conducted lumen depreciation tests on three of LOA's lifetime Lamps in its CALiPER program.  The test results for these three

lamps (2002LEDR30-65K, 2003LEDP38-65K, and 2025LEDE12-65K) show that all had reached $L_{70}$ within 1,000 hours.  (Id., ¶¶ 117-23.)

449.  The CALiPER tests provide further support of the falsity of the lifetime claims made on LOA's 2002LEDR30-65K, 2003LEDP38-65K, and 2025LEDE12-65K lamps.  None of these lamps lasted  as long as the average incandescent lamp.  (Id.)

450.  Based on LOA's internal test results and those from the CALiPER program, LOA's lifetime claims on the following lamps were all false: 2001LEDE26, 2002LEDR30-65K, 2003LEDP38-65K, 2025LEDE12-30K, 2025LEDE12-30K, 2025LEDE12-65K, 2026LED-65K, 2026LED-65K, 2026LED-30K, 2035LED-30K, and 2025LED-65K. (Id., ¶¶ 110-23.)

451.  LOA violated Section 5(a) of the FTC Act in making false claims about how long its Lifetime Lamps would last.

III.    Equitable, Monetary, and Other Relief.

   A.  Injunctive Relief.

452.  Under Section 13(b) of the FTC Act, "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction."  15 U.S.C. § 53(b); see also Pantron I, 33 F.3d at 1102; FTC v. H.N. Singer, Inc., 668 F.2d 1107, 1110 (9th Cir. 1982).

453.  This case is a "proper case" for injunctive relief under Section 13(b) because defendants made false and unsubstantiated claims in violation of Section 5.  See Pantron I, 33 F.3d at 1102; see also FTC v. Minuteman Press, 53 F. Supp. 2d 248, 260 (E.D.N.Y. 1998) ("proper case" includes any violation of the FTC Act).

454.  In addition to the requested permanent injunctive relief, "the Commission may frame a remedy which extends beyond the precise illegal conduct found" and includes "fencing-in" provisions.  FTC v. Colgate-Palmolive Co., 380 U.S. 374, 395 (1965); Sears, Roebuck & Co. v. FTC, 676 F.2d 385, 391 (9th Cir. 1982).

455.  A corporation is liable for violations of the FTC Act if it "engaged in misrepresentations or omissions of a kind usually relied upon by reasonably prudent persons and [] consumer injury resulted."  Pantron I, 33 F.3d at 1102.

456.  Injunctive relief against an individual for violations of the FTC Act is appropriate when the defendant participated directly in the violative conduct or had authority to control it.  FTC v. Garvey, 383 F.3d 891, 900 (9th Cir. 2004); Stefanchik, 559 F.3d at 931; FTC v. Publishing Clearing House, 104 F.3d 1168, 1170 (9th Cir. 1997).

457.  Authority to control "can be evidenced by active involvement in business affairs and the making of corporate policy."   (Minute Order, Mar. 31, 2011, Docket No. 87, p. 4. (quoting FTC  v. Am. Standard Credit Systems, Inc., 874 F. Supp. 1080, 1089 (C.D. Cal. 1994)).)  In addition, an individual defendant's "status as a corporate officer" or "authority . . . to sign documents on behalf of a

corporate defendant" is "sufficient to show the requisite control."  <u>Id.</u> (quoting <u>FTC v. Dinamica Financiera</u>, Case No. CV 09-03554 MMM (PJWx), 2010 U.S. Dist. LEXIS 88000, at *40 (C.D. Cal. Aug. 10, 2010)).); <u>Publishing Clearing House</u>, 104 F.3d at 1170-71.

458.  The particular kind of injunctive relief requested here accomplishes the primary purposes of the FTC's administrative powers:  (1) to enjoin the illegal conduct alleged in the First Amended Complaint; and (2) to prevent future violations of the law.  <u>Colgate-Palmolive</u>, 380 U.S. at 394-95.

459.  In determining whether to exercise the broad relief available under Section 13(b), courts examine whether:  (1) a cognizable danger of recurrent violation exists; or (2) some reasonable likelihood of future violations exists. <u>United States v. W.T. Grant Co.</u>, 345 U.S. 629, 633 (1945); <u>FTC v. Evans Prods., Co.</u>, 775 F.2d 1084, 1087-88 (9th Cir. 1985).

460.  To determine whether the type of injunctive relief requested is appropriate, the "ultimate question" is the likelihood that defendants will commit the kind of deceptive practices prohibited in the proposed order.  <u>Sears</u>, 676 F.2d at 391 (internal quotation marks omitted).

461.  Courts often analyze three factors to determine whether defendants are likely to commit future violations:  (1) the deliberateness of the violation; (2) the violator's past conduct with respect to advertising practices; and (3) the adaptability or transferability of the deceptive practice to other products.  <u>Sterling Drug, Inc. v. FTC</u>, 741 F.2d 1146, 1155 (9th Cir. 1984) (citing <u>Sears</u>, 676 F.2d at 392).

462.   The fact that the defendants are currently complying with the law "does not preclude an injunction."  Id. (citing Sears, 676 F.2d at 392).  All three factors need not be present to award a permanent injunction.  Telebrands Corp. v. FTC, 457 F.3d 354, 358-59 (4th Cir. 2006).

463.   Further, no one factor predominates and the importance of any one factor may depend on which others are present and to what degree.  Sears, 676 F.2d at 392 ("The more egregious the facts with respect to a particular element, the less important it is that another negative factor be present."); see also Telebrands, 457 F.3d at 358; Kraft, 970 F.2d at 327 (same).

464.   For the first factor – the deliberateness of the violation – the Court may consider facts such as whether defendants had substantiation to make the claims at issue.  See Telebrands, 457 F.3d at 359 (noting that the first factor favored a permanent injunction because defendant's violations did not involve inflated claims, but claims made without substantiation).

465.   The fact that defendants persisted in making the deceptive claims despite receiving repeated warnings about the falsity of their claims may also be relevant.  Kraft, 970 F.2d at 327.

466.   When defendants persist in making claims that they cannot meet, injunctive relief that prevents them from making misrepresentations in the future is warranted.  See FTC v. Zamani, No. SACV 09-0977-DOC(MLGx), 2011 WL 2222065, at *12 (C.D. Cal. June 6, 2011); FTC v. Magui Publishers, Inc., Civ. No. 89-3818RSWL(GX), 1991 WL 90895, at *15 (C.D. Cal. Mar. 28, 1991) (injunctive relief warranted because "defendants persisted in their conduct despite

103

having knowledge that it was illegal"); <u>FTC v. Medical Billers Network, Inc.</u>, 543 F. Supp. 2d 283, 323 (S.D.N.Y. 2008).

467.  A defendant's assertions of good faith that are based on its failure to ascertain the law related to its chosen line of business reinforces, and does not excuse, the need for permanent injunctive relief.  <u>FTC v. LoanPointe, LLC</u>, No. 2:10-CV-225DAK, 2011 WL 4348304, at *9 (D. Utah Sept. 16, 2011).

468.  When the Court evaluates the second factor – likelihood of recurrent violation – "[t]he existence of past violations may give rise to an inference that there will be future violations."  <u>SEC v. Murphy</u>, 626 F.2d 633, 655 (9th Cir. 1980).

469.  Past violations need not be present if other factors are sufficiently proven and weigh in favor of the permanent injunction.  <u>Kraft</u>, 970 F.2d at 327 (finding the seriousness and deliberateness of the violations "took precedence over the absence of any prior Kraft violations").

470.  A court should be more willing to find a possibility of recurrence "[w]hen the violation has been founded on systematic wrongdoing, rather than an isolated occurrence."  <u>CFTC v. Hunt</u>, 591 F.2d 1211, 1220 (7th Cir. 1979); <u>Gill</u>, 71 F. Supp. 2d at 1047; <u>FTC v. Sharp</u>, 782 F. Supp. 1445, 1454 (D. Nev. 1991).

471.  Deceptive practices are transferable to other products when the defendant's other products can be marketed using similar (deceptive) techniques. <u>Sears</u>, 676 F.2d at 392; <u>Minuteman Press</u>, 53 F. Supp. 2d at 261 (injunctive relief was warranted, in part, because defendants' current jobs allowed them to "remain

in a position to commit future violations"); <u>FTC v. Nat'l Urological Group</u>, 645 F. Supp. 2d 1167, 1209-10 (N.D. Ga. 2008) (current business "could serve as a platform for continuing violations of the FTC Act"); <u>Telebrands</u>, 457 F.3d at 361-62 ("Only Telebrands's imagination and budget would limit its ability to use similar tactics in the future.").

### 1. Injunctive Relief Against LOA Is Warranted.

472.  In advertising and marketing its LED Lamps with false and unsubstantiated claims, LOA misrepresented the light output and lifetime of its LED Lamps.  Those misrepresentations are claims consumers rely upon in selecting lighting products.  Because LOA's LED Lamps did not perform as advertised, consumers were harmed because what they purchased was something different than advertised.

473.  Due to the nature of the claims and LOA's misrepresentations of those claims, injunctive relief against LOA is appropriate and warranted.

### 2. Both Usman Vakil and Farooq Vakil Had the Ability to Control, and Thus Injunctive Relief Is Appropriate Against Them.

474.  Injunctive relief against both Usman Vakil and Farooq Vakil is also warranted and appropriate in this case.  As the sole owners and highest-ranking officers at LOA (President and Executive Vice President, respectively), both Usman Vakil and Farooq Vakil had the authority to control LOA's LED Lamp business at all times relevant to this case.

475.  Usman Vakil was actively involved in LOA's day-to-day affairs. Usman Vakil admits that he set the standard for LOA's employees to "substantiate everything."   There is no evidence that anyone had the ability to over-rule any decisions Usman Vakil would and did make about any matter related to LOA's operations or its LED Lamp business.

476.  Similarly, Farooq Vakil was also actively involved in LOA's day-today affairs.  In the time Farooq Vakil was in the office and during the early stages of LOA's LED Lamp sales, he inquired about the compatibility of LOA's LED Lamps with a supplier's LEDs.  For all aspects of LOA's business not managed by Usman Vakil, LOA's employees reported to Farooq Vakil.

477.  From at least August 2009, both Usman Vakil and Farooq Vakil actually asserted control over LOA's LED Lamp business.

478.  The evidence supports a finding that both Usman Vakil and Farooq Vakil had the authority to control LOA's LED Lamp business.

3.  <u>Tailored Injunctive Relief.</u>

479.  The particular type of relief the FTC requests accomplishes two important goals: (1) it enjoins defendants' illegal conduct; and (2) it seeks to prevent future violations of the law.

480.  The Court finds that it is reasonably likely that defendants will commit the kinds of deceptive practices at issue in this case.

481.  Although defendants disclaim any knowledge of their deceptive acts and practices, the Court finds that in continuing to make claims that were not properly substantiated for more than two years, defendants acted deliberately.

482.  In addition, the fact that defendants continued to make false and unsubstantiated Lifetime claims even after receiving test data showing that the claims were not only unsubstantiated, but false, lends to a finding of deliberateness.  This is particularly so when some of the data defendants received showing the falsity of LOA's Lifetime claims came from third party tests conducted on certain LED Lamps through the CALiPER program, which is part of the DOE.

483.  Moreover, defendants' claims of good faith, although not a defense or a mitigating factor for injunctive relief, is unsupported when that good faith is, at least in part, premised on an argument that because the lighting community was purportedly undecided and shifting on which test standards to adopt, they could not acquire proper substantiation. Such an argument ignores Section 5(a) of the FTC Act, which requires manufacturers to have a reasonable basis before making a claim.

484.  The Court finds a sufficient likelihood of recurrent violation. Defendants have previously been involved in litigation over false claims about its compact fluorescent products.  In addition, the type of activities that led to defendants making false and unsubstantiated claims appears to be a systemic one, involving delegation of much authority with no procedures in place to ensure corporate "policy" is followed.  That defendants never had proper substantiation

for their Lifetime claims during more than three years of sales of their products is evidence of a systemic problem warranting injunctive relief.

485. Finally, the deceptive acts here are easily transferable to LOA's other lighting products. LOA produces light bulbs and lots of them. Its product line includes fluorescents, compact fluorescents, and now, power LEDs. Claims about LOA's lighting products' light output and lifetime are now part of the uniform label printed on light bulbs. All of the defendants remain in position to commit the same deceptive acts again.

486. For all of these reasons, the Court finds that defendants: (a) acted with sufficient deliberateness; (b) have had prior experience with false claims; and (c) are in position to repeat their deceptive acts with the other lighting products they sell. As a result, injunctive relief is warranted.

B.     Equitable Monetary Relief.

       1.   Equitable Monetary Relief: LOA.

487. To obtain equitable monetary relief for consumers under Section 13(b) of the FTC Act, the FTC must establish that a company "engaged in misrepresentations or omissions of a kind usually relied on by reasonably prudent persons and that consumer injury resulted." Pantron I, 33 F.3d at 1102.

488. To demonstrate reliance and resulting consumer injury, the FTC must prove that defendant made material representations, that they were widely

disseminated, and that consumers purchased the defendant's product.  <u>Figgie Int'l</u>, 994 F.2d at 605-06.

489.  The FTC need not prove that every consumer relied upon the misrepresentations in order to prevail.  <u>Stefanchik</u>, 559 F.3d at 929 n.12 (quoting <u>FTC v. Amy Travel Serv., Inc.</u>, 875 F.2d 564, 572 (7th Cir. 1989)); <u>Figgie Int'l</u>, 994 F.2d at 605-06.  That there may have been modest rates of returns does not vitiate the misrepresentations or the need for equitable relief.  (<u>See</u> LOAFF, ¶ 468.)

490.  Requiring the FTC to prove subjective reliance by each consumer would "thwart effective prosecutions of large consumer redress actions and frustrate the statutory goals of [Section 13(b)]."  <u>Figgie Int'l</u>, 994 F.2d at 605 (internal quotation marks omitted).

491.  The Commission need only prove that material misrepresentations were widely disseminated and that consumers purchased products bearing those deceptive claims.  (<u>Id.</u> at 605-06.)

492.  Here, LOA made the Replaces Watts and Lifetime claims at issue.

493.  In making both the Replaces Watts and Lifetime claims, LOA misrepresented the amount of light its LED Lamps would produce and how long they would last.

494.  LOA designed its product packaging, including the Replaces Watts and Lifetime claims, with the expectation that consumers would rely on the information contained on its packaging.

109

495.  LOA widely disseminated its LED Lamps in product packaging that contained, at various times, both the Replaces Watts and Lifetime claims.

496.  LOA has admitted that it was and is aware of the importance of light output and lifetime claims on product packaging for light bulbs.

497.  Consumers purchased over 3 million of LOA's LED Lamps in packaging with deceptive and/or false claims, and thus, were harmed.  (Trial Exs. 295-99, 469.)

498.  As a result, LOA is liable for equitable monetary relief.

2.  Equitable Monetary Relief:  Usman and Farooq Vakil.

499.  An individual defendant who is liable for injunctive relief is liable for equitable monetary relief if the individual had sufficient "knowledge" of the company's violative conduct.  FTC v. Network Services Depot, Inc., 617 F.3d 1127, 1138 (9th Cir. 2010); FTC v. Affordable Media, LLC, 179 F.3d 1228, 1234 (9th Cir. 1999); Publishing Clearing House, 104 F.3d at 1171.

500.  The requisite degree of knowledge can be demonstrated by showing actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of the misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth.  Network Services, 617 F.3d at 1138; Cyberspace.com, 453 F.3d at 1202; Publishing Clearing House, 104 F.3d at 1170-71.

501.  Several courts have found "the degree of participation in business affairs is probative of knowledge." See, e.g., Amy Travel, 875 F.2d at 574; Medical Billers, 543 F. Supp. 2d at 320.

502.  Reckless indifference to the truth or falsity of the misrepresentations standard is evaluated objectively, and does not require any analysis of a defendant's subjective state of mind.  Network Services, 617 F.3d at 1140 & n.12; FTC v. Solomon Trading Co., No. CIV 91-1184-PHX-SMM, 1994 U.S. Dist. LEXIS 19696, at *12 (D. Ariz. June 28, 1994); Sharp, 782 F. Supp. at 1450.

503.  The FTC need not show intent to defraud for any of the elements demonstrating knowledge.  Publishing Clearing House, 104 F.3d at 1171.  The issue is whether the individual defendant "knew or should have known" of the company's violative conduct.  FTC v. Freecom Communications, Inc., 401 F.3d 1192, 1203 (10th Cir. 2005).

504.  The extent of an individual's involvement in the business affairs of a company engaged in deception "is sufficient to establish the requisite knowledge for personal restitutionary liability." Affordable Media, 179 F.3d at 1235; Amy Travel, 875 F.2d at 574; Am. Standard Credit Systems, 874 F. Supp. at 1089.

505.  Additionally, awareness of consumer complaints is sufficient to establish the "knowledge" requirement for individual liability. Cyberspace.com, 453 F.3d at 1202; see FTC v. MacGregor, 360 F. App'x 891, 894 (9th Cir. 2009); FTC v. Bay Area Bus. Council, Inc. 423 F.3d 627, 638 (7th Cir. 2005) ("To claim

ignorance in the face of the consumer complaints and returned checks amounts to, at the least reckless indifference to the corporations' deceptive practices").

506.  Evidence of "high refund and return rates" may show that the individual knew of the misrepresentations, or was at least recklessly indifferent to the truth of those representations.  MacGregor, 360 F. App'x at 894.

507.  A corporate officer acts with reckless indifference when he delegates responsibility to others (who then deceive the officer regarding the truth of the claims), fails to investigate complaints, and constructs an implicit or explicit "Chinese wall" between the delegator and delegee . Network Services, 617 F.3d at 1141; see also Sharp, 782 F Supp. at 1451-53 (rejecting arguments that corporate officers' reliance on others insulated them from liability for reckless indifference).

508.  The Court finds the degree of Usman and Farooq Vakils' participation in LOA's business is sufficiently probative of knowledge.  The Vakils are the highest ranking officers of the company who have final authority over all aspects of LOA's operations.

509.  In addition, from at least August 2009 on, both Usman and Farooq Vakil knew of, and asserted actual control over, LOA's deceptive Lifetime claims. From at least that point forward, knowledge need not be inferred; it was actual.

510.  Prior to August 2009, however, Usman and Farooq Vakil disclaim knowledge of LOA's claims and whether they were properly substantiated or false. The Court finds sufficient knowledge on their part in the following facts:

a. Usman Vakil decided that LOA would enter the LED lamp business;

b. LOA's lead engineer on its LED Lamps, Taj, testified that he discussed engineering problems and design issues concerning LOA's LED Lamps with Usman Vakil;

c. in 2008, Farooq Vakil discussed circuit designs with Taj and requested that Unity examine LOA's LED Lamp circuit designs;

d. Usman and Farooq Vakil participated in meetings with LOA's LED suppliers, such as Unity;

e. both Usman and Farooq Vakil received copies of LOA's early product brochures for its LED Lamps, which brochures included the lifetime and "incandescent comparison" claims);

f. Usman and Farooq Vakil received test data on components used in LOA's LED Lamps in 2008 that called into question the veracity of LOA's lifetime claims;

g. both Usman and Farooq Vakil knew of LOA's need to obtain lumen maintenance test data on its LED Lamps by the fall of 2008;

h. Usman Vakil knew about significant problems with the manufacturing of LOA's LED Lamps at LOA Shanghai;

I. both Usman and Farooq Vakil were informed of customer complaints from some of LOA's largest retailers;

j. Usman and Farooq Vakil received test reports on LOA's LED Lamps and the LEDs used in those lamps, which showed LOA's lifetime claims were not only unsubstantiated, but false; and

k. Usman Vakil decided and set the price for LOA's LED Lamps and in doing so, he compared LOA's LED Lamps to those of its

competitors by evaluating things like the competitors' lifetime claims.

511.  Even if the evidence of the Vakils' knowledge were not sufficient, the evidence demonstrates at a minimum that they acted with reckless indifference to the truth or falsity of LOA's claims on its LED Lamps.

512.  Both Usman and Farooq Vakil claim they delegated most of their responsibilities to their managers, such as Halliwell and Taj.  Yet, neither Usman nor Farooq Vakil put any procedures in place to ensure that the persons to whom they delegated such responsibilities followed through with the Vakils' instructions.

513.  Further, Farooq Vakil sent numerous emails to LOA employees during 2009 in which he identified and discussed the need for policies and procedures to address quality control and production problems.

514.  Both Usman and Farooq Vakil knew that one of LOA's largest customers, Costco, required LOA to take back several pallets of its LED Lamps that Costco ordered.  Costco took this action after receiving a copy of test data from DOE's CALiPER program showing that all of LOA's LED Lamps that were tested reached the end of their useful lives (under $L_{70}$) within 1,000 hours.  In addition to returning product, Costco also required LOA to inform its customers of this problem and provide refunds to any consumers who requested them.  That the Vakils continued to allow LOA to make false and unsubstantiated lifetime claims after this kind of action from a major customer like Costco is evidence of reckless indifference.

1    515.  For all the reasons above, the Court finds sufficient evidence of Usman

2    and Farooq Vakils' knowledge of LOA's deceptive acts or at least reckless

3    indifference to the truth or falsity of the representations.

4

5    516.  Equitable monetary relief apportioned jointly and severally among

6    LOA, Usman Vakil, and Farooq Vakil is appropriate.

7

8        C.    Restitution and Disgorgement.

9

10   517.  To determine the appropriate amount of monetary relief for both

11   restitution and equitable disgorgement, the FTC bears the initial burden of showing

12   that its "calculations reasonably approximated the amount of customers' net losses,

13   and then the burden shifts to defendants to show that those figures were

14   inaccurate."   FTC v. Febre, 128 F.3d 530, 535 (7th Cir. 1997); FTC v. Medicor,

15   LLC, 217 F. Supp. 2d 1048, 1058 (C.D. Cal. 2002).

16

17   518.  The proper measure of recovery for consumers is the full amount the

18   consumers paid.  Stefanchik, 559 F.3d at 931; Gill II, 265 F.3d at 958; Figgie Int'l,

19   994 F.2d at 606.

20

21   519.  Whether consumers received something of value from a defendant is

22   not relevant in determining liability or restitution under the FTC Act.  Figgie Int'l,

23   994 F.2d at 604; see also FTC v. John Beck Amazing Profits, LLC, 888 F. Supp.

24   2d 1006, 1018 (C.D. Cal. 2012) ; FTC v. Bronson Partners, LLC, 674 F. Supp. 2d

25   373, 385-86 (D. Conn. 2009).

26

27

28

520.  As the Ninth Circuit explained in <u>Figgie</u>, once a defendant is found liable for deceptive acts or practices "[w]e would not limit their recovery to the difference between what they paid and a fair price for [the product].  The seller's misrepresentations tainted the customers' purchasing decisions.  If they had been told the truth, perhaps they would not have bought [the product] at all or only some."  994 F.2d at 606.

521.  At a minimum, LOA's gross revenue is a proper measure for monetary liability in this case and any supposed value received by the consumer should not be deducted.  <u>See, e.g.</u>, <u>FTC v. Neovi, Inc.</u>, 604 F.3d 1150, 1159 (9th Cir. 2010) (disgorgement of total revenue without any offset for development and operating costs of defendant); <u>Stefanchik</u>, 559 F.3d at 931; <u>Bronson Partners</u>, 674 F. Supp. 2d at 385-86 (no offset for value of product); <u>FTC v. Transnet Wireless Corp.</u>, 506 F. Supp. 2d 1247, 1271 (S.D. Fla. 2007) (award of total sales minus refunds already provided to consumers).

522.  LOA's gross revenue (reflecting wholesale, not retail prices) is a conservative, yet proper measure for monetary liability in this case.

523.  The Court may also enter an award of equitable disgorgement – the amount of LOA's gross revenues from its illegal conduct in advertising and selling its products with unsubstantiated claims.  <u>See generally</u> <u>Bronson Partners</u>, 654 F.3d 359 (discussing appropriateness of disgorgement awards in FTC actions); and <u>FTC v. Medicor, LLC</u>, 217 F. Supp. 2d 1048, 1057-58 (C.D. Cal. 2002) (entering award of disgorgement for defendants' violations of Section 5(a) of the FTC Act).

524.  Disgorgement means LOA's gross revenues from its sale of the offending products.  <u>Bronson Partners</u>, 654 F.3d at 374-75 (noting that "defendants

in a disgorgement action are 'not entitled to deduct costs associated with committing their illegal acts,'" and citing SEC v. Cavanagh, No. 98-Civ-1818, 2004 WL 1594818, at *30 (S.D.N.Y. July 16, 2004), aff'd, 445 F.3d 105 (2d Cir. 2006)); Febre, 128 F.3d at 537 (noting that disgorgement prevents a defendant from being unjustly enriched by its fraud); Medicor, 217 F. Supp. 2d at 1057-58.

525.  Here, the appropriate amount of equitable relief under both restitution and disgorgement are the same: defendants' gross revenues from the deceptively advertised products.

526.  Total sales, based upon LOA's wholesale price, for the Replaces Watts Lamps through and including the dates indicated in paragraphs 70-71 above constitutes a conservative estimate of the amount of restitution owed to consumers who purchased these lamps.

527.  Similarly, total sales, based upon LOA's wholesale price, for the Lifetime Lamps from the first and last sales of those lamps constitutes a conservative estimate of the amount of restitution owed to consumers who purchased these lamps.

528.  LOA made deceptive and false 30,000 hour lifetime claims on its LED Lamps' for at least as long as it made unsubstantiated and false Replaces Watts claims on the Replaces Watts Lamps.  Thus, these two periods of false and deceptive claims overlap.

529.  However, LOA did not sell all of the same LED Lamp models with false and deceptive Replaces Watts and Lifetime claims.  LOA sold only one of the

117

Replaces Watts Lamps (2001LED10-65K) in packaging that did not contain a lifetime claim.  For all other Replaces Watts Lamps, LOA also made false and deceptive lifetime claims.

530.  Thus, to calculate total consumer harm arising from LOA's sale of its LED Lamps with false and deceptive light output and 30,000 hour lifetime claims, the Court need only calculate the gross revenue earned by LOA for its sale of the Lifetime Lamps, and then add to that number the gross revenue for LOA's sale of the one Replaces Watts Lamp for which it did not make a 30,000 hour lifetime claim (2001LED10-65K).

531.  LOA's gross revenue for the period of time it sold Replaces Watts Lamp 2001LED10-65K with the false and deceptive Replaces Watts claims (through April 2009) is:  $250,729.80.

532.  LOA's gross revenue for the Lifetime Lamps through August 2009 (when it reduced its 30,000 hour lifetime claim to 20,000 hours) is: $17,869,239.12.

533.  LOA's gross revenue for its sale of the Lifetime Lamps for the period of time it made 20,000 hour lifetime claims (September 2009 to August 2010) is: $3,045,852.15.

534.  LOA's gross revenue for its sale of the lifetime Lamps for the period of time it made 12,000 and 15,000 hour lifetime claims (September 2010 through at least April 2011) is: $250,772.20.

535.  LOA's total gross sales for all of its LED Lamps that it falsely and deceptively advertised through April 2011 equals: $21,165,863.47.

536.  LOA has not provided sufficient admissible evidence of any refunds it issued to consumers either through retailers or its warranty program to reduce the amount of equitable monetary relief that is appropriate in this case.

537.  Neither LOA nor its witnesses identified the amount of purported refunds, credits, or warranty claims with specificity, and in the case of its response to the FTC's interrogatory on this subject and based upon Ms. Clifton's testimony, LOA identified contractual credits which do not represent dollars returned to consumers.  LOA produced no documents in response to the FTC's document requests to adequately identify any amount of refunds it may have provided to consumers.  For these reasons, defendants have not met their burden to provide evidence of refunds to consumers to support a reduction of the amount of equitable monetary relief that is appropriate in this case.  Nor have the defendants provided evidence to show any errors in the FTC's calculation of consumer harm.

D.    Defendants Are Not Entitled To An Offset.

538.  LOA's claim for an offset due to a purported benefit consumers obtained by using its lower-energy LED Lamps has no merit.  Any additional cost savings a consumer would obtain by purchasing LOA's LED Lamps which operated by using less electricity was part of the benefit consumers purchased and paid for in the higher cost of LOA's LED Lamps.  Thus, none of the defendants are entitled to an offset to either restitution or disgorgement.

539.  In any event, defendants are not entitled to any value which consumers may have received.  Figgie Int'l, 994 F.2d at 604-06 ("The fact that heat detectors have some value does not alter this conclusion" that the defrauded consumer is entitled to a full refund); John Beck Amazing Profits, 888 F. Supp. 2d at1018.

540.  None of LOA, Usman Vakil, or Farooq Vakil are entitled to claim any offset to the amount of equitable monetary relief awarded in this case.

541.  LOA, Usman Vakil, and Farooq Vakil are hereby found jointly and severally liable in the amount of $21,165,863.47.

E.      LOA's Warranty Is Not a Defense To FTC Act Liability.

542.  Whether LOA had a warranty program for its LED Lamps and the scope and nature of that warranty are irrelevant.

543.  Whether LOA or the retailers to which it sold its products had warranty or return policies simply is of no import.  Cyberspace.com, 453 F.3d at  1201; Pantron I, 33 F.3d at 1103.

544.  LOA's warranty is not a defense to any of the claims pled against any of the defendants in this case.

F.      Good Faith Is Not a Defense to FTC Act Liability.

545.  The FTC has established defendants' violations by proving the three requisite elements of deception.  The FTC need not prove that defendants intended

to deceive consumers.  <u>Direct Marketing I</u>, 569 F. Supp. 2d at 298 (citing <u>Bay Area Bus. Council</u>, 423 F.3d at 635).  "Because the statute does not require an intent to deceive, the subjective good faith of the advertiser is not a valid defense to an enforcement action brought under Section 5(a)."  <u>FTC v. Sabal</u>, 32 F. Supp. 2d 1004, 1007 (N.D. Ill. 1998);  <u>FTC v. World Travel Vacation Brokers</u>, 861 F.2d 1020, 1029 (7th Cir. 1988); <u>Feil</u>, 285 F.2d at 896 ("Whether good or bad faith exists is not material, if the Commission finds that there is likelihood to deceive.").

546.  Consequently, defendants' assertion of "good faith" is an insufficient defense, and any evidence of such is immaterial.

547.  Any conclusion of law more properly characterized as a finding of fact shall be deemed so.

The FTC is ordered to submit a proposed form of judgment embodying the Court's ruling on all claims adjudicated in this action.

DATED: September 17, 2013

_____
JAMES V. SELNA
UNITED STATES DISTRICT JUDGE

121